STATE, Respondent, v. BOND, Appellant.

*No. State 46. Argued November 27, 1968.—Decided January 7, 1969.*

(Also reported in 163 N. W. 2d 601.)

222

For the appellant there was a brief by *Sydney M. Eisenberg* and *Eisenberg, Kletzke & Eisenberg,* attorneys, and *Alan D. Eisenberg* and *Michael W. Hogan* of counsel, and oral argument by *Jerome F. Pogodzinski,* all of Milwaukee.

For the respondent the cause was argued by *Harold B. Jackson, Jr.,* assistant district attorney of Milwaukee county, with whom on the brief were *Bronson C. La Follette,* attorney general, and *David J. Cannon,* district attorney.

HALLOWS, C. J.   Bond contends he is entitled to a reversal or at least a new trial for four reasons: (1) The court erred in finding he was not indigent and not entitled to a court-appointed counsel; (2) the jury selective system in Milwaukee county violated his right to a fair trial and sec. 255.04, Stats.; (3) the evidence was in-

sufficient to convict him of second-degree murder; and (4) the trial court erred in failing to instruct the jury on a manslaughter charge (sec. 940.05).

*Appointment of Counsel.*

Bond appeared by private counsel at the preliminary hearing and at the arraignment. The first day of the trial he moved the court to appoint counsel on the ground he was an indigent. The court determined that since he was steadily employed for over thirteen years, with a current take-home pay of $90 a week, he was not an indigent although he owned no property excepting a few bonds and a mortgaged car. At this hearing counsel stated he could work out his attorney's fees but his client had no funds with which to engage psychiatric witnesses. In denying the motion the court stated the motion could be renewed during the trial if facts warranted it. No such subsequent motion was made.

We do not think this record raises any question of the indigency of Bond or of a denial of the appointment of counsel. Since Bond was represented by private counsel throughout the trial, the argument amounts to a request to pay private counsel. At the trial, counsel stated he could work out his fees with Bond, which would be some basis for finding nonindigency. Cf. *State ex rel. Barth v. Burke* (1964), 24 Wis. 2d 82, 128 N. W. 2d 422. We point out this court appointed counsel for Bond on this appeal.

Counsel asks this court to reexamine the question of indigency in relation to the right to have counsel appointed at state expense and to lay down guidelines of hardship and standard of financial worth. Counsel seeks to have hardship equated with inability. We decline to reach out for this question. Compare sec. 957.26, Stats. (financially unable—without adequate means) and the Criminal Justice Act of 1964, 18 USCA, sec. 3006A (financially unable) with the American Bar Associa-

tion's Minimum Standard for Criminal Justice—Providing Defense Services, sec. 6.1 (substantial hardship) and Uniform Law Commissioners' Model Defense of Needy Persons Act, sec. 1 (3) (needy person—unable, without undue hardship).

### Jury Selection.

Milwaukee county is divided into 19 political districts, the city of Milwaukee and its 18 suburbs. Milwaukee city itself is divided into 19 wards which are apportioned by population. The jury commissioners of Milwaukee county have divided the county into three geographical areas and assigned each area to a commissioner. These commissioners select prospective jurors in their respective areas from the poll lists of the wards of Milwaukee and the suburbs. After an interview with the prospective jurors, the commissioners put the names of those who are qualified to serve as jurors under sec. 255.01, Stats., into separate envelopes pursuant to sec. 255.04 (2) (b) and place the envelopes in a reserve tumbler.

Milwaukee county operates on two active tumblers, one for the civil courts and one for the criminal courts, and the jury panels are drawn from these active tumblers. Two tumblers are authorized by sec. 255.04 (2) (b) 2, Stats., for counties having more than 10 branches of circuit and county courts. As an active tumbler becomes depleted, the senior judge of the criminal or civil courts orders the jury commissioners to replenish the respective tumbler. This is done by selecting at random the number of envelopes from the reserve tumbler necessary to replace the active tumbler.

### (a) Poll Lists.

Bond argues the poll lists do not represent a truly representative cross section of the population of the

community. We think the poll lists are a reasonable basis for selection and present a representative cross section of the community. Besides, a juror must be an elector and a citizen of the United States and the use of the poll lists automatically eliminates those who are not electors. Sec. 255.01, Stats. This elector requirement is reasonable in a democracy and has no built-in device which would prevent the list from being a representative cross section of the community. A defendant challenging the validity of the jury array has the burden of establishing a prima facie case of discrimination. *Whitus v. Georgia* (1967), 385 U. S. 545, 87 Sup. Ct. 643, 17 L. Ed. 2d 599; *Kopacka v. State* (1964), 22 Wis. 2d 457, 126 N. W. 2d 78. The present record is devoid of evidence that the poll lists in Milwaukee county are discriminative, either by calculation or by chance, against Negroes. The testimony showed the jurors are selected proportionately from the different wards of the county regardless of race, creed or color.

### (b) *Reserve Tumbler.*

Bond also argues the use of the reserve tumbler to replenish the civil and criminal master tumblers is a violation of sec. 255.04, Stats. While it is true the statute does not authorize the use of a reserve tumbler, we see no objection to the use of this tumbler from the evidence disclosed in this record. Milwaukee is a large county and the maximum of 500 names which are available in the criminal and civil courts tumblers are not sufficient as a practical matter to run the jury system in that county. Milwaukee county presently has from six to eight criminal courts and some 20 civil courts in session. These courts need juries. Normally, a juror serves on a panel for sixty days in Milwaukee county. The providing of jurors for the courts of Milwaukee county is a continuous process. There must be a reserve list of available jurors if the jury system is to work

efficiently in Milwaukee county. We think the Milwaukee system disclosed by the record is not in violation of and is substantially in compliance with ch. 255, Stats. Substantial compliance with this chapter is all that is required. *State v. Nutley* (1964), 24 Wis. 2d 527, 129 N. W. 2d 155, certiorari denied, 380 U. S. 918, 85 Sup. Ct. 912, 13 L. Ed. 2d 803, and 380 U. S. 922.

It is argued that a random selection from the reserve tumbler to fill the criminal or civil tumblers and then another random selection of names to draw the jury panel destroys the community cross section of the panel. This argument ignores the law of averages and also sec. 255.04 (2) (a), Stats., which provides for apportionment of jurors "as nearly as practicable." The Milwaukee system provides an apportionment of jurors as nearly as is practical considering the problems in Milwaukee. The jury selection system contemplates the intervention of chance and requires that chance must freely operate on a truly representative cross section of the community's population. Bond is not entitled to a perfectly apportioned representation on his jury of 12 but to only a fair jury from a panel selected without regard to race or other discriminatory factors. *Cassell v. Texas* (1950), 339 U. S. 282, 70 Sup. Ct. 629, 94 L. Ed. 839; *Whitus v. Georgia, supra.* All random selections have a potential of resulting in a jury of 12 which is not perfectly apportioned, but this is not to say that it is an unfair jury.

### (c) *Uneven Distribution.*

Bond next argues the reserve tumbler is not supplied with an appropriate share of names of each political subdivision in Milwaukee county. This argument is based on testimony that names are supplied to the reserve tumbler periodically and at those times the names are not drawn from all the wards. Thus a temporary disparity in proportion between wards might exist on a certain date because the commissioners cannot possibly

interview and select all jurors from all the districts on a single day. However, the commissioners keep a running total of the number of jurors selected from each ward and at any time the reserve tumbler containing from 1,800 to 2,000 names contains a cross section of the community if not technically a mathematical apportionment.

Bond argued that the Negroes were not properly represented on the jury panel and offered evidence relating only to the Sixth Ward of Milwaukee. The population of the Sixth Ward, which is predominantly Negro, is four percent of the population of the county and under the system used that ward would be entitled to 67.56 names on a strictly percentage basis. Actually, 90 names were included rather than 68 from the Sixth Ward. This certainly is not evidence of any exclusion of the class by the jury commissioners. *Whitus v. Georgia, supra; Sims v. Georgia* (1967), 389 U. S. 404, 88 Sup. Ct. 523, 19 L. Ed. 2d 634; *Jones v. Georgia* (1967), 389 U. S. 24, 88 Sup. Ct. 4, 19 L. Ed. 2d 25.

*Homicide by Misadventure.*

Bond claims the most the state proved was homicide by misadventure. This is a legalistic way of stating the killing was an accident. Misadventure is described as an excusable homicide such as when a person unfortunately kills another in doing a lawful act without any intent to kill and without criminal negligence. Clark & Marshall, *Crimes* (7th ed. 1967), p. 475, sec. 7.02; *see also* 1 Wharton, *Criminal Law* (12th ed. 1932), p. 666, sec. 428. But the facts show Bond walked into the Old Rail Tavern with a loaded gun looking for someone. The jury could well draw an inference that Bond's actions did evince a depraved mind regardless of human life and was conduct imminently dangerous to another. If one plays with matches in a hay stack, he can hardly claim that a resulting fire was neither intentional nor negligent. The

standard instruction for second-degree murder in Wisconsin Jury Instructions—Criminal, Part II, 1110, which the court used includes the statement the defendant's conduct cannot be "such as might casually produce death by misadventure." We think there was no error.

*Manslaughter Instruction.*

Bond claims it was error for the court to deny his request for an instruction on manslaughter. Sec. 940.05, Stats. He argues the refusal was error because "a reasonable person could have come to the conclusion that provocation existed, or that some state of mind less than that required for second-degree murder was possessed by the defendant." We think the trial court correctly concluded that the testimony in this case did not warrant an instruction for manslaughter. The only possible definition of manslaughter remotely applicable is that defined in sec. 940.05 (1), which requires the actor causing the death of another to be "without intent to kill and while in the heat of passion." The common-law definition of manslaughter is not applicable in Wisconsin. Common-law crimes were abolished. Sec. 939.10. *See also* Comment, *The Required State of Mind Under Wisconsin's Manslaughter Statute,* 1963 Wis. L. Rev. 636.

The evidence did not present a case of heat of passion. Bond exhibited no such frame of mind when beaten up or forty-five minutes later. But assuming such a state of mind in Bond, to constitute a legal defense it must be caused by a reasonable and adequate provocation, tested not by subjective existence of the state of mind of the actor, but rather whether the provocation would have caused such a state of mind of an ordinary person under the same circumstances. *Bosket v. State* (1966), 31 Wis. 2d 586, 143 N. W. 2d 553.

Furthermore, there was no request for instructions on any other lesser degree of homicide and this is a prerequisite for error. *Greer v. State* (1968), 40 Wis. 2d

72, 161 N. W. 2d 255. In many cases this court has stated in respect to instructions of lesser crimes that there must be a reasonable ground for a conviction on the lesser charge and for an acquittal of the greater charge before the trial court is required in submitting the lesser degree. *See Bosket v. State, supra.* There is no such lack of the evidence in this case which would justify an acquittal on the charge of second-degree murder so as to include an instruction on manslaughter.

*By the Court.*—Judgment affirmed.