MOES, Plaintiff in error, v. STATE, Defendant in error.

Supreme Court

*No. 77–038–CR. Argued September 12, 1979.—*
*Decided October 9, 1979.*
(Also reported in 284 N.W.2d 66.)

758

For the plaintiff in error the cause was argued by *Melvin F. Greenberg,* assistant state public defender, with whom on the briefs was *Howard B. Eisenberg,* state public defender.

For the defendant in error the cause was argued by *Pamela Magee-Heilprin,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

WILLIAM G. CALLOW, J. Mark A. Moes was convicted following a jury trial of first-degree murder, contrary to sec. 940.01, Stats., and a judgment of conviction was entered May 10, 1976, by the circuit court for Brown County. Defendant was sentenced to life imprisonment. A postconviction motion for a new trial was heard on May 23, 1977, and denied on May 25, 1977. The defendant now seeks review of the judgment of conviction and order denying a new trial.

The questions presented on review are:

(1) Must the prosecution persuade the factfinder beyond a reasonable doubt that the defense of coercion does not exist; and if so, were the jury instructions adequate?

(2) Did the trial court err in failing to instruct the jury that one who does not voluntarily agree to join a conspiracy is not a co-conspirator?

(3) Did the trial court abuse its discretion in showing Exhibits 39, 40, and 41 to the jury?

(4) Is a new trial necessary in the interests of justice?

This action commenced January 2, 1976, with the filing of a criminal complaint charging defendant Mark A. Moes with first-degree murder, contrary to sec. 940.-01, Stats. At the trial held in May, 1976, the state of-

fered evidence concerning the defendant's involvement in the shotgun slaying of Marvin Boguskie. The arresting officer, Detective Sergeant Richard Rice, testified that immediately after defendant was arrested, while getting into the police car, the defendant stated that he only brought the gun to the scene of the killing. The defendant repeated this after Sergeant Rice had advised him of his constitutional rights. He acknowledged that he understood his rights and stated a willingness to answer questions. During interrogation at the police station, the defendant was asked, "Did you shoot and kill Marvin Boguskie?" and he answered, "Yes, I did." The defendant then gave a detailed statement to Rice and Sergeant Hinz, the other arresting officer.

The defendant said he participated in a series of meetings involving plans in which the defendant was to kill Marvin Boguskie. He stated that he had several meetings with his very good friend, John Schroeder, following a call from Schroeder telling the defendant that Schroeder had a job for him. On the evening of the call from Schroeder, the defendant joined Schroeder and then met Wally Bergeron from Chicago who told the defendant that someone wanted another person killed and would pay the defendant $1,500 to do the killing. The following day the three met with Terry Neeley who said he wanted Boguskie, his stepfather, killed. The defendant said Neeley told him he would supply a gun the following morning so they could spend time practicing firing the gun. Neeley explained why he wanted Boguskie killed and showed defendant where Boguskie worked. Neeley said he had tried to get a .38 Special with a silencer, but having failed in that effort he agreed to furnish the defendant with one of his own guns. They practiced shooting Neeley's shotgun on Sunday. Neeley told the defendant to take the gun after shooting Boguskie to Neeley's home, which was also the victim's home,

where a rope would be hanging from a window. Neeley told the defendant to tug on the rope, tie the gun to the rope, and then "get the hell out of there." Neeley's teenage brother would get rid of the gun. Because Neeley would be at work, he would have a perfect alibi. The defendant stated the payment for killing Boguskie was to be $1,000 for him and $500 for Bergeron.

According to their first plan, the defendant was to kill Boguskie as he left work at 11 p.m. The defendant said Neeley told him to "make sure the guy is dead or else you are." The defendant stated he did not kill Boguskie at that time because too many people were present, and the defendant returned the gun to Bergeron's room at the YMCA. The defendant said his failure to kill Boguskie angered Bergeron and Neeley, and Bergeron told him if he did not do the job the next day, he would call Chicago and have somebody take care of the defendant and Boguskie.

The defendant then stated he was told a second plan; he was to kill Boguskie as Boguskie arrived home from work. Following this plan on the night of the murder, the defendant got a key from John Schroeder at a tavern and looked for the gun in Schroeder's room at the YMCA but failed to find it. The defendant returned and asked Schroeder where it was, and Schroeder told him where the gun was hidden. The defendant went back to Schroeder's room, found the shotgun, and then took it to the garage behind Boguskie's house. He returned to the garage later that night to wait for Boguskie to come home from work.

The defendant stated that when Boguskie arrived home, he shot Boguskie once in the back as Boguskie walked away from him and then "fired two more times as he was laying on his stomach." He stated that he then threw the shotgun on the roof of Boguskie's house, and a small boy stepped out onto the roof to retrieve it.

The defendant then stated he took the victim's wallet, according to the plan, to make the killing look like the motive was robbery and ran down the alley. He met his friends at a restaurant and went to the bathroom, where he threw up and counted the money he had taken from Boguskie's wallet.

Three photographs of Boguskie's body were admitted into evidence.

The defendant took the stand and testified that he was eighteen years of age and had been "very nervous" and "afraid" all his life. He testified that, although he signed each of the fifteen pages of the statement one at a time, he never read the statement. He testified he confessed to the killing of Boguskie thinking that the police would then arrest the people he named as accomplices, at which time his parents would be safe and he would then be able to tell the truth.

At trial the defendant raised the statutory defense of coercion,[1] contending that his participation in the killing of Boguskie was induced by Bergeron and Neeley's threats to kill the defendant and his family. The defendant testified that when he first met Bergeron, Bergeron bragged about knowing "influential people, strong people" in Chicago who "liked to blow cars up." In repudiating some and explaining other portions of his written statement the defendant testified that Bergeron did not tell him his job required him to kill someone and that he was "hoping and praying" that there were no plans to kill anyone. He testified that Bergeron told him he would be dead if he said anything and that he would have to do the job "or else."

---

[1] Sec. 939.46(1), Stats., provides: "A threat by a person other than the actor's co-conspirator which causes the actor reasonably to believe that his act is the only means of preventing imminent death or great bodily harm to himself or another and which causes him so to act is a defense to a prosecution for any crime based on that act except that if the prosecution is for murder the degree of the crime is reduced to manslaughter."

The defendant testified that when he did tell Neeley he really did not want to do the job, Neeley told him that all he would have to do was to bring the shotgun to the garage at 11 p.m. and someone else would do the killing. The defendant admitted doing this and said that one of Boguskie's sons climbed down a rope from an upstairs window, took the shotgun from the defendant, shot his father, and then climbed back up the rope.

## BURDEN OF PROOF RELATING TO THE DEFENSE OF COERCION AND SUFFICIENCY OF THE JURY INSTRUCTIONS

The defendant claims that the jury instruction as given allowed the jury to find the defendant guilty without determining beyond reasonable doubt that the defendant had not been coerced and therefore his conviction was obtained in violation of the due process clause and the rule of *In Re Winship*, 397 U.S. 358, 364 (1970). The defendant argues that an instruction erroneously allocating the burden of proof constitutes fundamental error affecting the substantial rights of the defendant.

The defense of coercion is a statutorily created defense to criminal liability. Sec. 939.46(1), Stats. The question presented concerns the burden of proof: Must the state prove beyond a reasonable doubt that a criminal defendant's actions were not coerced before he can be convicted of the crime charged when the defendant has raised the statutory defense of coercion? Both the defendant and the state concede that Wisconsin's criminal statutes and the retained common law rules of criminal law do not clearly resolve the issue. Both the defendant and the state urge resolution on constitutional grounds.

Before considering the constitutional arguments, we note the provisions of sec. 939.70, Stats.:

"939.70 **Presumption of Innocence and burden of proof.** No provision of the criminal code shall be construed as changing the existing law with respect to presumption of innocence or burden of proof."

The language of the section preserves that portion of Wisconsin criminal law bearing on burden of proof which existed prior to the enactment of the 1955 criminal code.

Under the 1953 statutes, the burden of disproving certain defensive matters was placed upon the state. Sec. 340.31, Stats. 1953, *Verdict,* provided that, if it appears homicide is committed under circumstances of justification or excuse, the jury shall return a verdict of "not guilty." The state was required to disprove, beyond a reasonable doubt, justification or excuse once they were offered by a defendant. *Odette v. State,* 90 Wis. 258, 262–63, 62 N.W. 1054 (1895); *Eckman v. State,* 191 Wis. 63, 68, 78–79, 86, 209 N.W. 715 (1926). Sec. 340.29, Stats., 1953, stated that homicide is justified when necessarily committed by public officers in the performance of their duties, or when committed in self-defense or the defense of others. Virtually identical sections in the present criminal code state that one committing homicide in such circumstances may claim the defense of privilege to criminal liability. Secs. 939.45(2), (3), (4); 939.48; 939.49. Sec. 340.30, Stats. 1953, stated that homicide is excused when committed by accident and misfortune in lawfully correcting a child or servant, or in doing any other lawful act by lawful means; its analogue in the present statutes is sec. 939.45(5).

Therefore, prior to the codification of the criminal code in 1955, the state was required to disprove beyond reasonable doubt statutory defenses of excuse or justification presented by the defense. These defenses were redefined in the 1955 criminal code as "privilege," and the precodification allocation of burden of proof was expressly preserved. Although the 1955 criminal code in-

cluded defenses to criminal liability which had not been recognized previously by statute (including the common law defense of coercion, a defense of excuse) in addition to those already in the statutes, sec. 939.70, Stats., indicates that the state must still bear the burden of proof once a defense of excuse or justification is raised.

The Wisconsin jury instructions recognized this burden and provide that, if the defendant introduces evidence to establish a statutory defense to criminal liability, the defendant must be found not guilty unless the jury is convinced beyond a reasonable doubt of the guilt of the defendant notwithstanding the proffered defense.[2]

No pattern jury instruction appears in the criminal jury instructions on the defense of coercion, but there is nothing to suggest that the statutory defense of coercion should be treated differently from the other statutory defenses to criminal liability. In the context of the criminal code, coercion is enumerated under defenses to criminal liability with involuntary intoxication, mistake, necessity, and self-defense and defense of others. Additionally, the statutes end the distinction between "justification" and "excuse" and denote the above-named defenses, including coercion, as examples of the defense of "privilege." Sec. 939.45, Stats. Its placement in the statutes indicates that the defense of coercion is to be treated the same as the other statutory defenses.

---

[2] Wis. J I—Criminal, Nos. 755 and 765 [Involuntary Intoxication, sec. 939.42, Stats., *Cf.*: *State v. Guiden*, 46 Wis.2d 328, 331, 174 N.W.2d 488 (1970)]; No. 770 [Mistake, sec. 939.43(1), Stats.]; No. 775 [Alibi, *Roen v. State*, 182 Wis. 515, 518–20, 196 N.W. 825 (1924)]; No. 780 [Entrapment, *Hawthorne v. State*, 43 Wis.2d 82, 91, 168 N.W.2d 85 (1969)]; Nos. 800, 805, 820, 825, 830, 855, and 860 [Self-defense, defense of others or of property, sec. 939.48, Stats.]; No. 880 [Peace officer's accomplishment of arrest, sec. 939.45(4), Stats.]; and Nos. 950 and 955 [Parental discipline, sec. 939.45(5), Stats.].

In *State v. Amundson,* 69 Wis.2d 554, 566, 230 N.W.2d 775 (1975), although the coercion defense was not an issue on appeal, this court noted that the trial court's instruction on that defense "required that the jury find for defendant if there was a reasonable doubt that he was coerced into committing the crime." *Id.* at 566–67. This comment is consistent with sec. 939.70, Stats., and its history.

We conclude the law existing at the time of the adoption of the criminal code and preserved by sec. 939.70, Stats., requires the state to bear the burden of disproving beyond a reasonable doubt an asserted coercion defense under sec. 939.46.

The defendant and the state urge that the decision of the United States Supreme Court in *Patterson v. New York,* 432 U.S. 197 (1977), controls the issue and claim it for support of their respective views.

*In Re Winship, supra,* held that the prosecution must prove beyond a reasonable doubt all elements of the offense with which a criminal defendant is charged. In *Mullaney v. Wilbur,* 421 U.S. 684 (1975), the Court applied *Winship* to strike down a Maine law which placed upon the defendant the burden of proving that he had acted in the "heat of passion" and therefore was guilty of manslaughter, not murder. In *Patterson,* a defendant charged with committing murder invoked *Mullaney* to challenge the New York law which placed the burden of persuasion with respect to the defense of extreme emotional disturbance on the defendant.

The Court affirmed Patterson's conviction of murder, noting that New York had satisfactorily proved beyond a reasonable doubt " 'every fact necessary to constitute the crime.' " 432 U.S. at 206. *Mullaney* was distinguished: While the Maine statute had included as an element of murder "malice aforethought," a state of mind

logically inconsistent with "heat of passion," the New York statute defining murder did not include such an element and merely provided for an affirmative defense of "emotional disturbance," a defense not negating a readily identifiable element of murder. 432 U.S. at 212–16.

Sec. 940.01, Stats., is very similar to the New York murder statute involved in *Patterson* which specified two elements of the crime: (1) intent to cause the death of another person; and (2) causing the death of such person or of a third person. Proof beyond a reasonable doubt of these elements satisfied the mandate of *Winship* that the state prove beyond a reasonable doubt "every fact necessary to constitute the crime with which he is charged." 397 U.S. at 364. *Patterson* makes clear that, if the state chooses to recognize a factor that mitigates the degree of criminality or punishment, it may assure itself that the factor has been established with reasonable certainty and that recognition of mitigating circumstances does not require the state to prove beyond a reasonable doubt their nonexistence. "The Due Process Clause, as we see it, does not put [the state] to the choice of abandoning those defenses or undertaking to disprove their existence in order to convict of a crime which otherwise is within its constitutional powers to sanction by substantial punishment." *Patterson*, 432 U.S. at 207–08. The Court concluded New York had satisfied the mandate of *Winship* saying:

"We thus decline to adopt as a constitutional imperative, operative countrywide, that a State must disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses related to the culpability of an accused. Traditionally, due process has required that only the most basic procedural safeguards be observed; more subtle balancing of society's interests against those of the accused have been left to the legislative branch. We therefore will not disturb the balance struck in previ-

ous cases holding that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged. Proof of the non-existence of all affirmative defenses has never been constitutionally required; and we perceive no reason to fashion such a rule in this case and apply it to the statutory defense at issue here." *Patterson,* 432 U.S. at 210.

Here the defendant argues that the statutory defense of coercion negates criminal intent, an element of the offense in the crime charged. He contends that the prosecution must therefore negative his defense of coercion in order to prove the intent to kill required by sec. 940.01, Stats. We conclude the weight of authority supports the conclusion reached in *People v. Graham,* 119 Cal. Rptr. 614, 616 (Cal. App. 1975), which held: "The defense of duress does not negate an element of the crime."

Though we conclude that the federal due process clause does not require the state to disprove beyond reasonable doubt the statutory defense of coercion, this burden is imposed upon the state as a matter of Wisconsin law. Having reached this conclusion, we address the issue raised by the omission of the phrase "beyond a reasonable doubt" at one particular point in the jury instructions. The defendant claims the omission invalidates his conviction. In evaluating instructions given to a jury, we recognize they are to be considered in their entirety; and if the error is rendered harmless because of other correct statements of law contained in the instructions, there are no grounds for reversal. Furthermore, even if the error is not rendered harmless by other portions of the instructions, there is no reversible error unless it may reasonably be said that, had the error not been made, the verdict might probably have been different. *Werner v. State,* 66 Wis.2d 736, 750, 226

N.W.2d 402 (1975) ; *Loveday v. State,* 74 Wis.2d 503, 518, 247 N.W.2d 116 (1976).

■

The jury instructions pertaining to the first-degree murder charge were as follows:

"If you are satisfied beyond a reasonable doubt from the evidence in this case that the defendant did commit the act of shooting Marvin K. Boguskie or was a party to the crime as previously defined for you, and if you are further satisfied that the defendant's participation in such act, whether in "actually committing the act or as a party to the act, was not coerced by threats of imminent death or great bodily harm to himself or his family by persons other than co-conspirators, and you further find that at any time before doing such act, the defendant had formed in his mind the purpose to take the life of Marvin K. Boguskie, and that the act of shooting Marvin K. Boguskie was done or participated in, in pursuance of such mental purpose, then you should find the defendant guilty of murder in the first degree, as charged in the information and recited in Verdict No. 1.

"If you are not so satisfied, then you must find the defendant not guilty of murder in the first degree and consider whether the defendant is guilty of manslaughter as is set forth in Verdict No. 2."

The defendant contends that this part of the instructions is defective because the phrase "beyond a reasonable doubt" was applicable only to the first phrase rather than being prefatory to the entire paragraph. We do not agree that the prefatory admonition is limited to the first phrase. Consideration of the instructions in their entirety makes clear that the jury was instructed at several points that it could find the defendant guilty of first-degree murder only if it determined beyond reasonable doubt that he had not been coerced and was guilty of first-degree murder.

## THE JURY INSTRUCTIONS—DEFINITION OF CO-CONSPIRATOR

At the close of testimony on May 7 the defendant requested the trial judge to include the following in the jury instructions:

"Likewise, a person who does not voluntarily agree or combine with one or more other persons for the purpose of committing a crime is not a co-conspirator."

He argued that the coercion defense should be available if Moes' participation in a conspiracy to murder Boguskie was coerced. After a discussion, the judge denied the request, stating that the instructions he proposed to give on coercion and conspiracy were adequate. At the next conference between the court and counsel, the judge read the instructions he proposed to give to the jury. He did not include the instruction requested by the defense counsel concerning coercion of a co-conspirator. The judge asked counsel, "Are there any Instructions that you wish to spread across the record that I have not included?" Counsel for the state and the defendant answered in the negative. After the jury was instructed, the court asked counsel if he had misread or misstated anything, and they again responded in the negative. We conclude the rule of withdrawal of objection set forth in *Bethards v. State,* 45 Wis.2d 606, 616, 173 N.W.2d 634 (1970), applies. Counsel is required to preserve objections to jury instructions, and failure to preserve the objections constitutes a waiver. We do not find that the failure to give the requested instruction deprived the defendant of jury consideration of his defense, and we do not believe that giving the instruction would have resulted in a different verdict. If the instructions of the court adequately cover the law applicable to the facts, the court has stated it will not find error in the refusal of special instructions even though the refused instructions themselves would

not be erroneous. *State v. Lenarchick*, 74 Wis.2d 425, 455, 247 N.W.2d 80 (1976).

"This court looks to the instructions as a whole in determining whether they were appropriate, and, even though instructions were rejected which arguably were appropriate, this court will not reverse unless the failure to include the requested instructions would be likely to prejudice the defendant. It is totality of the instructions as given that must be judged in light of the facts that the jury is asked to resolve." *Id.* at 455.

The trial judge delivered Wis. J I—Criminal, 400 B. 1.— Conspirator. This instruction was approved in *State v. DiMaggio*, 49 Wis.2d 565, 580, 182 N.W.2d 466 (1971). The instruction repeatedly emphasizes that there must be "agreement," "mutual understanding," or "a meeting of the minds" to further "common criminal objectives" for a "common criminal purpose." The evidence presented by the defendant obviously was intended to make clear that the focal point of his defense was the involuntary, coerced nature of the defendant's actions. Involuntary, coerced participation negates the possibility of "agreement" or "common purpose." The trial court's phrasing of the required findings in terms of "agreement," etc., rather than voluntariness was not "likely to prejudice the defendant" and was therefore not error.

## ADMISSION OF PHOTOGRAPHS OF THE VICTIM

The photographs involved here constituted Exhibits 39, 40, and 41. The defendant objected to their admission but was overruled by the trial court. The issue was raised on a postverdict motion. The motion was denied.

The trial court stated that in its opinion the pictures would "be an aid to the jury to better enable them to understand the evidence in this case." The photographs

depict the victim from several different angles at the place where he fell and show the relative positions of the victim, the garage, and the house. None of the pictures could be considered gruesome or inflammatory. Exhibits 39 and 40 do not show the victim's wounds or his face, nor is any blood apparent. The victim's face is visible in Exhibit 41. His eyes are closed, a small trickle of blood runs from his nose. His wounds are not readily visible, as one would expect from the evidence. The jury's own knowledge of the effects of close-range shotgun fire, and the pathologist's testimony of pellets passing entirely through the victim, might have led a jury to believe that two gaping holes had been blown through the victim's body. In this light, the exhibits could be viewed as actually tempering the jury's tendency to allow improper considerations to affect its judgment. It was not error to submit the pictures to the jury. *See: Hammen v. State,* 87 Wis.2d 791, 802–03, 275 N.W.2d 709 (1979).

## NEW TRIAL IN THE INTERESTS OF JUSTICE

Defendant contends that he is entitled to a new trial in the interests of justice. A new trial in the interests of justice will only be granted if it appears that there has been a miscarriage of justice and that a new trial under optimum conditions will produce a different result. *Okrasinski v. State,* 51 Wis.2d 210, 219, 186 N.W. 2d 314 (1971). There is no indication that a new trial would be likely to produce a different result in this case or that justice has not been served.

*By the Court.*—Judgment and order affirmed.