STATE of Wisconsin, Plaintiff-Respondent,†

v.

Carroll D. WATKINS, Defendant-Appellant.

Court of Appeals

*No. 00–0064–CR. Oral argument March 6, 2001.—Decided April 24, 2001.*

## 2001 WI App 103

(Also reported in 628 N.W.2d 419.)

†Petition to review granted.

205

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Steven P. Weiss,* assistant state public defender. There was oral argument by *Steven P. Weiss.*

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle,* attorney general, and *Stephen W. Kleinmaier,* assistant attorney general. There was oral argument by *Stephen W. Kleinmaier.*

Before Fine, Schudson and Curley, JJ.

¶ 1. SCHUDSON, J. Carroll D. Watkins appeals from the judgment of conviction for second-degree intentional homicide, following a bench trial,[1] and from the order denying his motion for postconviction relief. He argues that: (1) the State failed to meet its burden of proving beyond a reasonable doubt that the shooting was not accidental; (2) trial counsel rendered ineffective assistance by failing to investigate the victim's background, and thus failing to apprise the trial court of information about the victim that would have supported the defense theories of self-defense and accident, and would have established mitigating factors at sentencing; (3) the case was not fully or fairly tried and, therefore, a new trial is required in the interest of justice; (4) the thirty-year prison sentence is unduly harsh; and (5) resentencing is required, under *State v. Spears*, 227 Wis. 2d 495, 596 N.W.2d 375 (1999), to allow the court to consider additional information about the victim.

¶ 2. We conclude that the evidence did not disprove, beyond a reasonable doubt, Watkins' defense that the shooting was accidental. Accordingly, we need not address Watkins' other arguments, and we reverse. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663 (1938) ("As one sufficient ground for support of the judgment has been declared, there is no need to discuss the others urged.").

## I. BACKGROUND

¶ 3. Watkins and Glenn Malone were members of an Omaha, Nebraska-based traveling crew of a com-

---

[1] The judgment of conviction incorrectly indicates that Watkins' trial was to a jury. On remand, the clerk is instructed to correct the error.

pany that had contracted to clean equipment at a power plant in Oak Creek. They had known each other and worked together for about one and one-half years and, for this job, they were rooming together at a motel in Oak Creek. They had not had previous problems with each other but, on the night of April 19, 1998, in their motel room, Watkins shot and killed Malone.

¶ 4. The State charged Watkins with first-degree reckless homicide, while armed. When Watkins declined to plead guilty, the State filed an amended information charging him with first-degree intentional homicide, while armed. Following a bench trial, however, the trial court found Watkins guilty of second-degree intentional homicide and sentenced him to thirty years in prison.

¶ 5. Watkins was the only source of information about most of the circumstances leading to the shooting. He gave a statement to Oak Creek Police Detective Andre Antreassian and testified at trial. Watkins said that on April 19 he and his crew had completed the job at the power plant and were preparing for their return to Omaha the next day. He discovered that a pair of his work gloves was missing from the company truck he had been driving, and he mentioned this to Malone. Malone admitted taking the gloves, and later he returned them.

¶ 6. Watkins said that after his conversation with Malone, he told his supervisor, Gerald (Jerry) Dorr, about the work-gloves incident as they were doing their laundry in the motel laundry room. Malone came in and may have overheard Watkins' conversation with Dorr. No further problems or discussion about the gloves, however, occurred until hours later.

¶ 7. That evening, Watkins and Malone were in their motel room socializing and drinking beer with

Dorr and another member of their crew, Gallen Null. Watkins and Malone each drank about five or six beers. Watkins testified that at about 10:30 p.m., shortly after Dorr and Null left their room, he commented on the fact that Malone had not been wearing a shirt as they socialized with Dorr and Null. Watkins explained that "as a man[-]to[-]man friendly gesture," and in a "light-hearted, comradery [sic] way," he told Malone "that he didn't have to sit there without his shirt on showing his muscles off in front of [Dorr]." Watkins testified that the statement "just was something to break the conversation open so [he] could get around to saying [t]hat [he] wanted to talk to [Malone] about the gloves." Additionally, Watkins testified, "I wanted to tell Mr. Malone that I respected him for admitting to taking 'em and thank him for returning them right away and that we would go on with our friendship, and I would not hold it against him."

¶ 8. According to Watkins, Malone did not appreciate his comments. Detective Antreassian, reading portions of his supplemental report of Watkins' statement following his arrest, testified:

> Watkins stated that he brought up the glove incident to Glenn, and Glenn became very upset and got loud and went to his bed . . . talking about racial prejudices, and Watkins stressed . . . that he's not prejudiced, and his reply to Glenn was, ["]Glenn, you know, I'm not prejudiced.["] And Watkins stated that Glenn then went to his bed, . . . that Glenn was very upset, and at this point Watkins took the gloves and tossed them lightly at Glenn, and they landed next to Glenn on the bed. Watkins stated that he then said to Glenn, ["H]ere you go, keep 'em.["]

. . .Glenn threw the gloves back at him, hitting him in the chest, and Watkins thinks he may have tossed the gloves back towards Glenn, but he is . . . unsure.

. . . [A] verbal argument still continued, and as [Watkins] was sitting in the . . . chair near the window area, Glenn got up from the bed and approached him, . . . standing over him with a bottle of Budw[e]iser, shaking and trying to intimidate [him]. . . . Glenn implied that he would hit Watkins with the bottle but never did.

¶ 9. Watkins, according to Detective Antreassian's testimony, then described a series of confrontations in which Malone grabbed him and shook him, with Malone returning to his own bed after each episode.[2] Detective Antreassian continued:

Watkins told me that things were calming down when all of a sudden Glenn Malone got up again from his bed for the fourth time, and he approached Mr. Watkins, who was still seated in the chair, and he grabbed Mr. Watkins with both of his hands around the front part of the hooded sweatshirt and lifted Mr. Watkins completely off the chair, throwing him back in the chair, saying he was going to fuck him up.

Watkins described Glenn's demeanor as very upset, and Glenn was gritting his teeth, talking through his teeth and [with] an intense anger in his face. Watkins stated that . . . Glenn's intensity grew every time he had returned from sitting on the bed.

Watkins stressed that at no time did Glenn physically punch him or assault him but did grab

---

[2] In his trial testimony, however, Watkins said that Malone grabbed and shook him in three separate episodes after the comments about showing off his muscles but *before* the gloves were mentioned.

him by the front of the sweatshirt and shook him intensely. Watkins then explained . . . that Glenn stomped off and went back to his bed, and at this point Watkins became very, very upset.

Watkins stated that he reached into his briefcase and got out his gun and pointed it at Glenn. Watkins stated that he definitely knew his gun had been loaded, and he also was aware that Glenn knew the gun had been in the room.

Watkins stated that as he was pointing [ ]his gun at Glenn from across the room, he stated, ["T]hat's it, I'm not taking no more shit. One of us has to go, you or me. One of us has to make the call.["] Watkins stated that he held the gun on Glenn as he moved towards the phone, stating[, "D]on't move, don't get up.["] Watkins stated that he was trying to calm the situation, and he felt if he pointed the gun at Glenn, Glenn would be in fear and would not assault him anymore, any further.

Still pointing the weapon at Glenn while Glenn was lying on the bed, . . . Watkins was able to call . . . the room of Jerry Dorr. . . .

. . . [O]nce the phone had been answered by Jerry, he stated, . . . ["]Jerry, I need you down here right away, or I'm going to kill him.["]

Watkins . . . then . . . clarified . . . that [h]e stated, ["]I'm not sure if I said kill him, but I did say for sure, Jerry, I need you down here right away.["] . . . Watkins told me that he hung up the phone, and he kept the gun pointed out with a full extension of his right arm, stating, ["]don't move,["] to Glenn.

. . . .

. . . [A]s [Watkins] was standing at the foot of the bed with his arms fully extended and the gun pointed at Glenn, Glenn got off the bed, walked slowly towards Watkins, and Glenn was talking. Watkins stated that he was unsure what Glenn was

211

saying, but Glenn was talking in a low key and with no anger.

. . .[W]hen Glenn got a couple feet away from Watkins, Glenn grabbed for Watkins' gun arm, and Watkins let his instincts go, and everything happened so fast he just heard a boom and saw Glenn go down.

Watkins stated that he did not intentionally shoot Glenn, it just went off by instincts.

Under cross-examination, Detective Antreassian clarified that, in his report of Watkins' statement, he repeatedly referred to Watkins saying that the gun "went off by instincts" because that was "the only phrase [he] would get out of [Watkins]" during the interview.

¶ 10. Watkins testified that Malone was particularly violent during the fourth confrontation:

This time he was really upset and he grabbed me by the sweatshirt, and he just literally pulled me up out of my chair so hard that I was off my feet, but he slammed his fist into my jaw, which loosened my lower plate and ended up cutting my gum pretty bad. He said, ["]I ought to fuck you up, I could kill you,["] and he just hurled me backwards in the chair[;] chair went over, I slammed into the wall.

¶ 11. In his testimony, Watkins also offered added details of the shooting. He said that after calling Dorr, he looked toward the door, "hoping Jerry's going to come through," and then:

I felt [Malone] grab my right hand, right wrist, and that I had the gun in. My gun arm. I turned back around real quick, something hit me in the face, I jump, I realize he's grabbed my arm, I jump for his arm, and I grabbed his wrist.

. . . .

212

There is a struggle for possession of the gun. We were trying to keep it away from us. I went to get in tight so I could have some control over it, he reaches and grabs it with his other arm or other hand, and we're swinging back and forth, and it goes off.

. . . .

. . . I did not intentionally pull the trigger.

. . . .

I feel that when he was grabbing it with his right hand and trying to wrestle it from my grasp, I just tightened up, instinctively tightened up the hold onto it. Once I realized he was going for the gun, I just—everything I had went to try and to maintain control of the gun. I didn't want anybody getting hurt.

¶ 12. Substantial independent evidence provided possible corroboration for certain aspects of Watkins' account:

(1) Dorr testified, confirming that Watkins had told him about the work gloves that afternoon in the laundry room. He also testified that when he was socializing with Watkins and Malone in their room between about 9:00 and 10:30 p.m., the atmosphere was friendly, the gloves were not mentioned, and he sensed no antagonism between Watkins and Malone. He confirmed that at about 11:10 or 11:15 that night, Watkins called him and said: "[Y]ou better get down here, I'm going to kill him. . . . [J]ust get down here." Dorr also testified that, as he approached Watkins' room right after the shooting, Watkins was on the sidewalk in front of the room "screaming at the top of his lungs, 'why didn't you stop, why didn't you stop?' . . . [a]most like

he was addressing Glenn," and that, when he asked Watkins what was wrong, Watkins answered, "[O]h, my God, I killed him, I killed him."

(2) Susan V. Sanders, a forensic scientist from the Wisconsin State Crime Laboratory, testified that DNA evidence collected from Malone's right hand fingernail clippings carried Watkins' blood and/or skin tissue.

(3) Photographs of Watkins taken shortly after his arrest showed abrasions and blood on the bridge of his nose, directly beneath his left eyebrow, on his chest and upper abdomen and, possibly, on his hands.

(4) Dr. Jeffrey M. Jentzen, Milwaukee County Medical Examiner, testified that "the weapon was within a one- to three-inch area distance from the skin of the right cheek [of Malone] at the time the weapon was fired."[3]

(5) Detective Antreassian, comparing the physical evidence to Watkins' reenactment of the incident during their interview, was asked "[w]hether it was impossible for it to have occurred the way [Watkins] said." Detective

---

[3] Inexplicably, the prosecutor, in closing argument, maintained that "[t]he medical examiner told us that the entrance wound was about one inch below the right eye, that there was tattooing around the entrance wound, which would indicate that the shot was from a distance of about eighteen [inches] to two feet when the shot was fired." Defense counsel, however, correctly stated the medical examiner's testimony regarding the firing distance, and the trial court, in its verdict decision, found that Watkins "discharged the weapon within one to three inches of the victim."

Antreassian answered: "No. It was very possible the way he said." The evidence also established that after the shooting, Watkins placed a towel over Malone's head, remained at the scene, waited for police, offered no resistance to his arrest, and was cooperative.

¶ 13. In its oral decision finding Watkins guilty of second-degree intentional homicide, the trial court found that Watkins "did intentionally kill the victim while believing that he was in danger but used more force than was reasonably necessary in the situation." The court acknowledged that "the injuries . . . to the defendant's head and chest, as well as the DNA under the victim's fingernails, support the testimony that *a struggle did take place*." (Emphasis added.) While also acknowledging that Watkins "had no duty to retreat from the room," the court commented that "the door was always a reasonable option" and that "[r]etreat seems, clearly, to have been a viable option and one that [Watkins] knew about during the entire confrontation, but according to his testimony, never considered." Focusing on the moment of the shooting, the court also observed:

> I don't believe that the defendant formed the intent well in advance of the action or even minutes in advance, but the evidence supports that *when the victim approached him and reached for the gun*, whether you call it instinct or not, he formed the requisite intent and acted upon it and rejected other available options.

(Emphasis added.)

¶ 14. In its written decision denying Watkins' motion for postconviction relief, the court further explained:

215

The court expressly rejected defendant's claim of accident by finding that the [S]tate had proven him guilty of second[-]degree intentional homicide beyond a reasonable doubt. The [c]ourt did consider the defendant's assertion of accident and found it not credible in light of all of the evidence. . . .

. . . In meeting the burden of proving that an intentional homicide took place . . . beyond a reasonable doubt, the [S]tate also disproved the accidental theory of the defense.

## II. DISCUSSION

¶ 15. Watkins argues that the State failed to negate his accident defense and that the trial court failed to consider it. Relying on all the evidence and emphasizing the testimony of *prosecution* witnesses, Watkins persuasively posits a reasonable hypothesis consistent with his innocence—that, in arming himself with the gun, pointing it at Malone and warning him to stay away, and calling Dorr to intervene, he was reasonably acting in self-defense and that, when struggling with Malone for the gun, he shot Malone accidentally. Watkins maintains that the State failed to disprove that defense beyond a reasonable doubt. We agree.

¶ 16. A defendant who raises an affirmative defense of accident to a charge of first-degree intentional homicide may not be convicted unless the State's evidence proves all the elements of the crime beyond a reasonable doubt, and also disproves the defense beyond a reasonable doubt. *See Moes v. State*, 91 Wis. 2d 756, 763–68, 284 N.W.2d 66 (1979).[4]

---

[4] In its brief to this court, the State contended that "accident is not an affirmative defense," but rather, "is merely a denial of

¶ 17. Frequently, Wisconsin appellate courts quote portions of *State v. Poellinger*, 153 Wis. 2d 493, 451 N.W.2d 752 (1990), to summarize the standard of review for challenges to the sufficiency of evidence to support a criminal conviction. Here, we do so again, emphasizing certain passages because, as we will explain, our decision in this case derives directly from the application of these standards to the trial court's factual findings:

> *Regardless of whether the evidence presented at trial to prove guilt is direct or circumstantial, it must be sufficiently strong and convincing to exclude every reasonable hypothesis consistent with the defendant's innocence in order to meet the demanding standard of proof beyond a reasonable doubt.*
>
> . . . .
>
> The rule that the evidence must exclude every reasonable hypothesis of innocence does not mean that if any of the evidence brought forth at trial suggests innocence, the [fact finder] cannot find the defendant guilty. The function of the [fact finder] is to decide which evidence is credible and which is not and how conflicts in the evidence are to be resolved. The [fact finder] can thus, within the bounds of reason, reject evidence and testimony suggestive of innocence. *Accordingly, the rule that the evidence must exclude every reasonable hypothesis of innocence refers to the evidence which the [fact finder] believes and relies upon to support its verdict.*
> . . . The appellate standard of review of the sufficiency of evidence to support a conviction is the

intent." At oral argument before this court, however, the State abandoned that position and conceded that accident is an affirmative defense that must be disproved beyond a reasonable doubt to gain a conviction.

same whether the evidence presented at trial is direct or circumstantial.

Under that standard, commonly referred to as the reasonable doubt standard of review:

> 'The burden of proof is upon the state to prove every essential element of the crime charged beyond reasonable doubt. The test is not whether this court or any of the members thereof are convinced [of the defendant's guilt] beyond reasonable doubt, but whether this court can conclude the trier of facts could, acting reasonably, be so convinced by evidence it had a right to believe and accept as true . . . . The credibility of the witnesses and the weight of the evidence is for the trier of fact. In reviewing the evidence to challenge a finding of fact, we view the evidence in the light most favorable to the finding. Reasonable inferences drawn from the evidence can support a finding of fact and, if more than one reasonable inference can be drawn from the evidence, the inference which supports the finding is the one that must be adopted . . . .'

*Id.* at 502–04 (emphases added; citations and footnotes omitted). Here, *accepting the evidence the trial court believed and relied upon to support its verdict*, we conclude that the evidence, viewed most favorably to the State and to the verdict, did not disprove Watkins' accident defense beyond a reasonable doubt.

¶ 18. Significantly, as we have noted, the trial court specifically found that Watkins believed that he

was in danger,[5] that Watkins' injuries and the DNA evidence "support[ed] the testimony that a struggle did take place," that Watkins shot Malone when "[Malone] approached him and reached for the gun," and that the fatal shot was fired from a distance of one to three inches.

¶ 19. Essentially, the trial court rejected only Watkins' claim that, at the final moments, the shooting was accidental. As Watkins points out, however, the trial court, in its verdict decision, did not mention Watkins' accident defense or articulate any basis for rejecting it. And in its decision denying Watkins' post-conviction motion, the court summarized the evidence, stated that it had "rejected defendant's claim of accident by finding that the [S]tate had proven him guilty of second[-]degree intentional homicide beyond a reasonable doubt," but only specifically addressed that theory of defense by stating that it "did consider the defendant's assertion of accident and found it not credible in light of all of the evidence."

¶ 20. The court, however, did not identify what, in "all of the evidence," disproved the accident defense beyond a reasonable doubt, given its several critical factual findings supporting Watkins' account. We have searched the trial record and, fully accepting the trial court's factual findings regarding the substantial evidence supporting Watkins' defense, we conclude that the evidence, viewed most favorably to the conviction, failed to disprove Watkins' defense beyond a reasonable doubt.

---

[5] At Watkins' sentencing, the prosecutor even acknowledged that "[t]here certainly is evidence that Mr. Watkins felt that there might be some type of great bodily harm to himself." Neither the prosecutor nor the trial court ever suggested that Watkins' belief was unreasonable.

¶ 21. Added support for our conclusion comes from comments of both the prosecutor and the trial court at sentencing. The prosecutor noted, "In my perspective of it, it's somewhat vague what happened." And the trial court observed:

> I don't feel after hearing all the testimony that we really know what happened that night.
> . . . I don't think that we know the real dialogue that took place between [Watkins and Malone], why things got out of control and why there was such anger and aggression exhibited. I don't think that I was ever really told the full facts in the trial.
> I don't think it had to do with not wearing a shirt, I don't think it had to do with gloves. I don't know what it had to do with. Perhaps the defendant knows, but I certainly don't feel that I came out of the trial understanding why this situation took place.
> I do note that it was out of character for the defendant. He doesn't have a history of violence, he doesn't have a history of antisocial behavior, he doesn't have a history with this particular victim of having any antagonism or bad feelings.
> They worked together for a year and a half and had gotten along quite well during that time period, so why it took place and erupted on that evening is a tragedy that we'll probably never understand entirely.
> I don't believe that it was planned, I don't believe that it was a setup from earlier in the day, I think it erupted on the spot and at that time for reasons unknown.

¶ 22. Confronted with its sentencing comment, "I don't feel after hearing all the testimony that we really know what happened that night," the court, in its post-conviction decision, maintained that "[t]his statement

was taken out of context and referred to the fact that the defendant had been inconsist[e]nt in his explanations of what took place between the victim and himself **prior to the final confrontation."**[6] Still, the court offered *no evidentiary basis for, on the one hand, accepting Watkins' account of the events leading up to the shooting and acknowledging that his conduct and character were inconsistent with violent, antisocial behavior,*[7] *and, on the other hand, rejecting his account of the final moments preceding the shooting.* Or viewed somewhat differently, and with the benefit of the court's additional comments at sentencing, the postconviction court offered *no evidentiary basis for conceding so much uncertainty about the events leading up to the shooting while, at the same time, asserting such certainty about the next split seconds.*

¶ 23. While certainly not dispositive, the shaky foundation for the rejection of Watkins' accident defense may also be detected from the progression of some of the State's arguments. As noted, in his closing argument, the prosecutor, without any evidentiary

---

[6] Any inconsistencies, however, were either unspecified or relatively slight; for example: whether Malone's aggressiveness preceded Watkins' mention of the gloves; whether Watkins told Detective Antreassian that he (Watkins) had made a big mistake; and whether, as the State maintains in its brief to this court, Watkins, in his statement to Detective Antreassian, "never claimed that Malone grabbed the gun," but "only told Antreassian that Malone grabbed for his gun arm."

[7] The relationship between Watkins and Malone, by all accounts, was a cooperative one. In fact, even Watkins' laundry chores on the afternoon of the shooting seemed to suggest their compatibility. Watkins testified: "I talked to Glenn, and he had a few whites, and I just had a few whites, so him and I together, we could make up a load. So we combined our whites together, and I got those washed up."

support, erroneously asserted that the fatal shot was fired from a distance of eighteen inches to two feet. Had he been mindful of the true distance—one to three inches—what could he have argued to disprove the defense of accident beyond a reasonable doubt? And, as noted, in its brief to this court, the State initially and erroneously sought to support this conviction by arguing that "accident is not an affirmative defense" that must be disproved beyond a reasonable doubt.

¶ 24. At oral argument, however, having conceded the error of its earlier contention about the accident defense, the State offered an intriguing, alternative argument: that under the circumstances of this case, Watkins could not invoke the accident defense. The State cited the supreme court's declaration in *State v. Bond,* 41 Wis. 2d 219, 228, 163 N.W.2d 601 (1969), that "[i]f one plays with matches in a hay stack, he can hardly claim that a resulting fire was neither intentional nor negligent." Thus, the State argued, Watkins, having introduced a loaded gun into a volatile situation, could not claim that the shooting was accidental.

■

¶ 25. We disagree. We appreciate the trial court's comment that "the door was always a reasonable option" for Watkins, and we recognize that, at the very least, Watkins' decision to arm himself with a loaded gun was an extremely dangerous one. We cannot conclude, however, as a matter of law, that a person, fearing further attack, who arms himself with a loaded gun, points it at the aggressor, warns him to stay away, and calls for help has precluded the invocation of an accident defense to a shooting that occurs when the aggressor struggles for the gun.

¶ 26. Here, unquestionably, the evidence—and, indeed, virtually all the trial court's critical factual findings—rendered a reasonable hypothesis consistent with Watkins' accident defense. Doubts abound, and any suggestion that the evidence disproved the accident defense beyond a reasonable doubt would be based on pure speculation. *See Foseid v. State Bank of Cross Plains*, 197 Wis. 2d 772, 791, 541 N.W.2d 203 (Ct. App. 1995) (verdict cannot be based on "conjecture and speculation"); *Cudd v. Crownhart*, 122 Wis. 2d 656, 662, 364 N.W.2d 158 (Ct. App. 1985) (verdict cannot be based on "mere speculation").

¶ 27. This was a terribly difficult case in many respects, and our decision should not be read as a criticism of the trial court. Indeed, the record reflects the trial court's earnest efforts to carefully consider the evidence and render just decisions. Even more importantly, we recognize that this shooting brought tragedy to two families. We have carefully reviewed the letters and statements offered at sentencing, and we fully appreciate the Malone family's compelling call for justice. We recognize, therefore, that our decision can only intensify the pain produced by Glenn Malone's death. Like both families, we would so much prefer to turn back the clock, but our authority allows us only to apply the law and trust that, someday, justice will come for all.

*By the Court.*—Judgment and order reversed and cause remanded.

FINE, J. *(dissenting).*

1. *Sufficiency of the evidence.*

¶ 28. The majority gives lip service to *State v. Poellinger*, 153 Wis. 2d 493, 451 N.W.2d 752 (1990), but, in my view ignores its teaching that "an appellate court may not substitute its judgment for that of the trier of fact unless the evidence, viewed most favorably to the state and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *Id.*, 153 Wis. 2d at 507, 451 N.W.2d at 757–758. Here, in my view, the trial court gave more weight to what Carroll D. Watkins told the police officer immediately after the shooting than it did to Watkins's testimony. This it was permitted to do. It was also permitted to disregard parts of either Watkins's statement to the police officer or Watkins's testimony, and, rather, decide the case on the evidence as a whole.

¶ 29. In its oral decision finding that Watkins had the requisite intent, the trial court noted that:

- before pulling the trigger, Watkins told his foreman that the foreman had better come to the room before Watkins killed the victim;

- Watkins took his gun out of a briefcase, pulled the slide back, and loaded a bullet in the chamber;

- with the freshly loaded gun in his hand, Watkins "mov[ed] toward the victim."

¶ 30. Although not specifically mentioned by the trial court in its oral decision, the following from the officer's report of what defendant told him, and from defendant's trial testimony, supports the trial court's verdict:

- Watkins, who had been abused by the victim earlier, "became very very upset" *after* the vic-

tim had let him go and the victim "stomped off and went back to his bed."

- The victim was on his own bed and was not then threatening Watkins when Watkins got and loaded his gun, and pointed it at the victim.

- The victim was still on his own bed when Watkins, pointing the freshly loaded gun at him, told their foreman that he, Watkins, needed the foreman "right away or I'm going to kill him."

- After telling the foreman that he might "kill" the victim, Watkins "kept the gun pointed out with a full extension of his right arm," warning the victim: "Don't move."

- The victim, however, did move, and "got up off of the bed [and] walked slowly towards" Watkins.

- When the victim "got a couple of feet away from" Watkins, the victim "grabbed for Watkins' gun arm and Watkins let his instincts go and every thing happened so fast, he just heard a boom and saw [the victim] go down." (Uppercasing omitted.)

¶ 31. As the State cogently points out in its brief on this appeal, "the court could find that [Watkins] fired the gun before [the victim] grabbed his arm," and that there was no struggle over the gun. Indeed, this is precisely what the trial court did find: "I don't believe that [Watkins] formed the intent well in advance of the action or even minutes in advance, but the evidence supports that *when the victim approached him and reached for the gun,* whether you call it instinct or not,

he formed the requisite intent and acted upon it and rejected other available options." (Emphasis added.)

¶ 32. "Intent" is an element of second-degree intentional homicide. WIS. STAT. § 940.05(1). " 'With intent to' or 'with intent that' means that the actor either has a purpose to do the thing or cause the result specified, or is aware that his or her conduct is practically certain to cause that result." WIS. STAT. § 939.23(4). Under our criminal law, a person "intends" to do an act if he or she forms that intent, or awareness, at any time before the act—even a fraction of a second before. *Perugi v. State*, 104 Wis. 230, 242–245, 80 N.W. 593, 595, 597–598 (1899) (approving the following jury instructions: " 'There may be no appreciable space of time between the intent to kill and the act of killing . . . It is enough that the intent to kill preceded the fatal act although the act followed instantly.' "), *overruled on other grounds, Montgomery v. State*, 128 Wis. 183, 198, 107 N.W. 14, 19 (1906).

¶ 33. In my view, the trial court rationally rejected a Billy-Budd, reflexive explanation, found that the State had disproved beyond a reasonable doubt "accident," and determined that Watkins did, in fact, intend to kill the man who had been abusing him all evening. Under our standard of review, we must affirm the conviction. *See Poellinger*, 153 Wis. 2d at 507, 451 N.W.2d at 758 ("If any possibility exists that the trier of fact could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt, an appellate court may not overturn a verdict even if it believes that the trier of fact should not have found guilt based on the evidence before it.").

## 2. *Ineffective assistance of counsel.*

¶ 34. Watkins also claims that his trial lawyer gave him ineffective assistance because the lawyer did not seek to introduce evidence of the victim's violent past. Assuming that such evidence would be admissible even though Watkins does not claim that he knew about the instances he says his lawyer should have sought to have admitted, *see* WIS. STAT. RULE 904.05(2) ("In cases in which character or a trait of a person is an essential element of a . . . defense, proof may also be made of specific instances of the person's conduct."); *McMorris v. State*, 58 Wis. 2d 144, 150 & 150 n.11, 205 N.W.2d 559, 562 & 562 n.11 (1973) (characterizing as "consistent" with the then proposed RULE 904.05, the proposition that "where there is a sufficient factual basis to raise the issue of self-defense, and the turbulent and violent character of the victim is an essential element of the defense, proof should be admitted as to both the reputation of the victim and the defendant's personal knowledge of prior relevant conduct of the victim"); *Werner v. State*, 66 Wis. 2d 736, 744 n.6, 226 N.W.2d 402, 406 n.6 (1975) (specific instances of conduct are not admissible under RULE 904.05(2) "to prove that the victim was the aggressor in a fight"), there is no evidence that Watkins shot the victim in self-defense. Accordingly, neither the victim's reputation nor specific acts of his alleged violent conduct in the past would have been material. Thus, Watkins was not deprived of his right to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984) (defendant claiming ineffective assistance of counsel must show that his or her defense was prejudiced by the alleged deficiency of the trial lawyer's representation).

### 3. *Sentence.*

¶ 35. Although we give great latitude to a trial court's exercise of its sentencing discretion, *Ocanas v. State*, 70 Wis. 2d 179, 185, 233 N.W.2d 457, 461 (1975), we will overturn a sentence if it is "so excessive and unusual and so disproportionate to the offense committed as to shock public sentiment and violate the judgment of reasonable people concerning what is right and proper under the circumstances." *Ibid.* Given Watkins's concededly exemplary life prior to this tragic shooting, I believe that the sentence is shockingly not "right and proper under the circumstances." Accordingly, I would remand the matter to the trial court for resentencing.

### 4. *Other claims.*

¶ 36. In a repeat of his other arguments, Watkins claims that he is entitled to discretionary reversal under WIS. STAT. § 752.35. I disagree. Larding a final catch-all plea for reversal with arguments that have already been rejected adds nothing; "[z]ero plus zero equals zero." *Mentek v. State*, 71 Wis. 2d 799, 809, 238 N.W.2d 752, 758 (1976).