STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Carroll D. WATKINS, Defendant-Appellant.

Supreme Court

*No. 00–0064–CR. Oral argument December 4, 2001.—Decided July 11, 2002.*

2002 WI 101

(Also reported in 647 N.W.2d 244.)

265

For the plaintiff-respondent-petitioner the cause was argued by *Stephen W. Kleinmaier,* assistant attorney general, with whom on the briefs was *James E. Doyle,* attorney general.

For the defendant-appellant there was a brief and oral argument by *Steven P. Weiss,* assistant state public defender.

¶ 1. DAVID T. PROSSER, J. This is a review of a published decision of the court of appeals that reversed Carroll Watkins' conviction for second-degree intentional homicide. *State v. Watkins,* 2001 WI App 103, 244 Wis. 2d 205, 628 N.W.2d 419. Watkins was prosecuted for first-degree intentional homicide. He acknowledged that he pointed a loaded handgun at Glenn Malone and that the gun discharged. He asserted, however, that he

was acting in self-defense when he initially pointed the gun and that the shooting was an accident, occurring as he and Malone struggled for the gun. After a trial to the bench, the circuit court for Milwaukee County, Mel Flanagan, Judge, determined that Watkins "did intentionally kill the victim while believing that he was in danger but used more force than was reasonably necessary in the situation." The court found Watkins guilty of second-degree intentional homicide and sentenced him to 30 years in prison.

¶ 2. The court of appeals reversed Watkins' conviction in a split decision authored by Judge Schudson. The court determined that the state had not presented sufficient evidence at trial to disprove Watkins' defense that the shooting was accidental. *Id.* at ¶ 1. In dissent, Judge Fine disagreed with the determination that there was insufficient evidence to convict but asserted that the case should be remanded to the circuit court for resentencing because Watkins' sentence was "shockingly not 'right and proper under the circumstances.' " *Id.* at ¶¶ 28, 35 (Fine, J., dissenting).

¶ 3. We granted the State's petition for review, and now affirm the court of appeals reversal of Watkins' conviction, on different grounds. We conclude, after a thorough examination of the record and the circuit court's findings, that the real controversy in this case was not fully and fairly tried. We therefore exercise our statutorily-recognized power of discretionary reversal under Wis. Stat. § 751.06 (1999–2000),[1] to reverse the judgment of conviction. Accordingly, we modify and affirm the decision of the court of appeals and remand the case to the circuit court for a new trial.

---

[1] All subsequent references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise indicated.

## I. BACKGROUND

¶ 4. The facts of this case are drawn in large part from the trial record, especially the testimony of Watkins and Detective Andre Antreassian, who interviewed Watkins shortly after the shooting and prepared a lengthy report which he recounted at trial.

¶ 5. In April 1998 Carroll Watkins was 46 years old. Glenn Malone was 43 years old. The two were employees of a Nebraska company that sent crews of workers to different locations throughout the Midwest to clean industrial sites. In mid-April Watkins and Malone were part of a crew dispatched to Oak Creek to clean the air heaters at a power plant. Watkins and Malone shared a room in an Oak Creek motel but seldom saw each other because they worked different shifts. Watkins said he knew Malone for a year-and-a-half and described the two as "close acquaintances" but not friends.

¶ 6. The crew finished its work at the power plant on April 19, 1998 at around noon, and expected to leave the next day. Late that afternoon, Watkins was gathering his dirty clothes from the truck he had driven to Oak Creek when he noticed that a pair of his work gloves was missing from the truck. On his way to the motel laundry room, Watkins saw Malone and mentioned that someone had taken his gloves. According to Watkins, Malone admitted that he had taken the gloves and said he would return them. When Watkins got to the laundry room he saw the crew supervisor, Gerald Dorr, and told Dorr about Malone taking his gloves.[2]

---

[2] Malone entered the laundry room shortly thereafter, but neither Watkins nor Dorr knew whether he heard them talking about the gloves.

¶ 7. When Watkins returned to the motel room, Malone had returned the gloves and the two did not talk about them. Later that afternoon, Watkins and Malone went to a store to buy beer, and that evening the two, along with Dorr and another crew member, Gallen Null, sat in their room "drinking beer, smoking cigarettes and laughing, joking, talking about everything under the sun." The four did not discuss the gloves. Null and Dorr left the room at around 10:30. Watkins and Malone remained in the room, Watkins sitting in a chair in the corner of the room, Malone in a chair a few feet from the door.

¶ 8. Shortly after Dorr and Null left the room, Watkins decided to speak to Malone about the gloves.[3] After Watkins and Malone began talking, Malone became angry and confronted Watkins. Watkins claims that Malone came over to him, grabbed his sweatshirt,[4] and shook him. Malone then let go, walked away, and sat down on his bed.

¶ 9. According to Watkins, Malone returned a short time later and again grabbed Watkins' sweatshirt and shook him. After Malone released Watkins, he again went back to his bed, but returned a third time and again grabbed Watkins' sweatshirt and shook him. Malone allegedly held an empty beer bottle by the neck

---

[3] Watkins testified that he began the conversation by talking to Malone about Malone's decision not to wear a shirt while Null and Dorr were in the room. He claimed that he said that Malone "didn't have to sit there without his shirt on showing his muscles off in front of the supervisor."

Detective Antreassian's report does not indicate that Watkins told him about a discussion of Malone's not wearing a shirt.

[4] Watkins was wearing a hooded sweatshirt with a vertical zipper in the front.

as "an implied threat" during at least one of the three confrontations.[5] After shaking Watkins for the third time, Malone again returned to his bed. Watkins testified that Malone did not physically harm him during any of these three incidents.

¶ 10. Watkins claimed that after the third confrontation, he continued to speak to Malone in an attempt to calm him down. Malone, however, approached him for a fourth time, and confronted him in a manner more violent than during the previous confrontations. The specifics of the fourth confrontation are very much disputed.

¶ 11. Detective Antreassian's report indicates that Watkins said Malone "grabbed Watkins with both of his hands around the front part of the hooded sweatshirt and lifted Watkins completely off the chair, throwing him back in the chair, saying he was going to fuck him up." The report further states, "Watkins stressed that at no time did [Malone] physically punch him or assault him." Watkins testified, however, that Malone:

> grabbed me by the sweatshirt, and he just literally pulled me out of my chair so hard that I was off my feet, but he slammed his fist into my jaw, which loosened my lower plate and ended up cutting my gum pretty bad. He said I ought to fuck you up, I could kill you, and he just hurled me backwards in the chair, chair went over, I slammed into the wall.

Watkins explained that his head hit the wall, and that

---

[5] Detective Antreassian's report indicates that Watkins stated that Malone carried a beer bottle the first time he confronted Watkins, brandishing it as though he would hit Watkins with it. Watkins testified that Malone threatened him with the bottle during the second and third confrontations.

while he didn't immediately notice any injury, the next day he had "a pretty good size goose egg."

¶ 12. Malone returned to his bed and sat down. Watkins now very angry, reached into his briefcase and pulled out his gun.[6] Watkins testified that he took the gun out of its case, "slid it back, popped a round in the chamber, let him know that the gun was loaded, and I pointed it at him."[7] Watkins told Detective Antreassian that he attempted to calm the situation by pointing the gun at Malone. Watkins testified that he said, "that's it, man, I've had enough of this shit." He then told Malone that one of them had to get out of the room. With the gun pointed at Malone, Watkins moved towards the phone which was about four feet from the foot of Malone's bed. Watkins testified that when he got to the phone, Malone was 10 or 12 feet away. Watkins called Dorr, who was in bed and nearly asleep. Dorr testified that he answered the phone just before 11:15 and that Watkins was agitated and told him "you better get down here, I'm going to kill him." Dorr, who thought from the tenor of the phone call that he "was going to come down there and break up a fight," got dressed and started towards the room occupied by Watkins and Malone.

¶ 13. Watkins continued to point the gun at Malone, holding it in his right hand, his finger on the trigger. Malone got up and started towards him. Watkins told Malone that he would get another room and

---

[6] Malone knew that Watkins had a gun in his briefcase. Watkins had taken the gun out that afternoon when Null had been in the room. Malone examined the gun at that time.

[7] Detective Antreassian's report indicates that the gun was already loaded when it was in the briefcase. It states that Watkins, "reached into his briefcase and got out his gun and pointed it at [Malone]," and that Watkins "definitely knew his gun had been loaded."

that Dorr was on his way. Watkins testified that he told Malone not to move, but that Malone kept approaching until he got to the foot of the bed, face to face with Watkins. Watkins said that he looked away, towards the door to see if Dorr was coming in.

¶ 14. What occurred after Watkins looked away led to Malone's death and Watkins' conviction for second-degree intentional homicide, and is greatly disputed. According to Detective Antreassian's report, "Watkins stated that when [Malone] got a couple of feet away from Watkins, [Malone] grabbed for Watkins' gun arm and Watkins let his instincts go and every thing happened so fast, he just heard a boom and saw [Malone] go down. Watkins stated that he did not intentionally shoot [Malone], it just went off by instincts."

¶ 15. Watkins testified at trial that when he looked away to see if Dorr was coming:

> I felt [Malone] grab my right hand, right wrist, and that I had the gun in. My gun arm. I turned back around real quick, something hit me in the face, I jump, I realize he's grabbed my arm, I jump for his arm, and I grabbed his wrist.

Once the two had grasped each other's arms:

> There is a struggle for possession of the gun. We were trying to keep it away from us. I went to get in tight so I could have some control over it, he reaches and grabs it with his other arm or other hand, and we're swinging back and forth, and it goes off.

¶ 16. Watkins testified that he did not allow Malone to take the gun because he thought Malone would shoot him with it. He described his action of grabbing Malone's wrist to keep control of the gun as "instinc-

tive." Watkins testified that he did not intentionally pull the trigger but that his hand instinctively tightened up and the gun fired when Malone grabbed the gun and tried to wrestle it away.

¶ 17. After the shot went off, hitting Malone in the face, Malone fell sideways. Watkins bent over Malone and "hollered, Glenn, Glenn" and then ran to the door to see if Dorr was approaching.

¶ 18. When Dorr arrived, Watkins was outside the room. Dorr testified that Watkins was "screaming at the top of his lungs, why didn't you stop, why didn't you stop?" Dorr asked Watkins what had happened and Watkins said, "oh man, I killed him, I killed him." Dorr looked into the room and saw Malone on the floor, and then entered the room. Dorr testified that Watkins remained outside the room, saying, "I told him to stop, to leave me alone." Dorr left the room, returned to his own room, and called the police.

¶ 19. When police arrived, Watkins was taken into custody and interviewed by Detective Antreassian, who wrote the report referenced above.[8] Watkins was then arrested and charged with first-degree reckless homicide, pursuant to Wis. Stat. § 940.02(1), with a penalty enhancer for allegedly committing a crime while armed with a dangerous weapon, pursuant to Wis. Stat. § 939.63. The State later amended the complaint, charging Watkins with first-degree intentional homicide, while armed, pursuant to Wis. Stat. §§ 940.01(1) and 939.63.

---

[8] Officers videotaped the scene of the shooting, but did not record the questioning of Watkins on videotape or audiotape. Detective Antreassian took notes as he questioned Watkins and wrote his report from those notes. He did not preserve his notes after writing the report. Watkins did not sign any statement.

¶ 20. Watkins waived his right to a jury trial, opting for a bench trial that lasted two days, October 20 and 30, 1998. Watkins' defense at trial was that he was acting in self-defense when he pointed the gun at Malone, and that Malone was shot accidentally when the two struggled for possession of the gun. The State, conversely, argued that Watkins had acted intentionally, shooting Malone in the face at point-blank range, with no struggle.

¶ 21. At trial, Detective Antreassian recounted Watkins' statement and testified that he had written down essentially everything Watkins said to him.[9]

---

[9] Detective Antreassian's written report of April 20, 1998, is different in some details from the criminal complaint he signed on April 21. For instance, the April 20 report reads: "Watkins stated that he brought up the glove incident to Glenn and Glenn became very upset and got loud and went to his bed, talking about racial prejudice [sic] and his reply to Glenn was, 'Glenn you know I'm not prejudice [sic].' "

The criminal complaint states: "Carroll Watkins then brought up the fact that the gloves had been stolen. Glenn Malone got upset and Carroll Watkins stated that Glenn Malone then went to his [Glenn Malone's] bed, but that Glenn Malone was still upset. Glenn Malone was upset because Carroll Watkins was accusing him of being a thief for stealing his work gloves."

In the report, Detective Antreassian also wrote that he "observed that there had been a cut to the forehead of Watkins, as well as a cut on his nose." He "could observe that there had been a scratch mark to Watkins' left chest near the throat area, and also a scratch to the right of his chest." The report stated that Detective Antreassian "wanted to verify what type of story Watkins had before questioning him on where the actual scratches and cuts had come from." Nothing in the remainder of the report or in Detective Antreassian's testimony indicates that he ever asked Watkins about his cuts or scratches.

¶ 22. The court also heard uncontroverted testimony from three expert witnesses. Dr. Jeffrey Jentzen, the medical examiner for Milwaukee County who supervised the autopsy performed on Malone, testified that in his opinion, Malone was shot in the right cheek from a distance of one to three inches, Malone was standing when he was shot, and the shot was fired slightly upward. Dr. Jentzen further testified that Malone had an abrasion on his forehead that could have been consistent with being scraped by the end of a gun barrel and an abrasion on Malone's hands that occurred contemporaneously with the gunshot wound and was consistent with his having been scratched by another person's fingernails gripping or gouging Malone's hand. Finally, Dr. Jentzen testified that blood on Malone's hands could indicate that Malone's hands had been raised in a defensive position when he was shot, or could indicate that his hands had been gripping the gun when the gun was fired.

¶ 23. Susan Sanders, a forensic scientist at the Wisconsin State Crime Laboratory, testified that the DNA sample taken from under one of Malone's fingernails included both Malone's and Watkins' DNA.

¶ 24. Finally, Monty Lutz, a forensic scientist, fire and tool mark examiner, with the State of Wisconsin Crime Laboratory, testified that the gun with which Malone was shot would fire only if the hammer was moved back and the trigger was pulled. He also testified that firing the gun required an average pull, but that the gun could be fired if the person holding it had his or her finger on the trigger and the gun was pulled away from that person.

279

¶ 25. On November 12, 1998, the circuit court issued an oral decision finding Watkins guilty of second-degree intentional homicide, pursuant to Wis. Stat. § 940.05. The court stated:

> [T]he State has proven the charge of second degree intentional homicide where privilege of self-defense is an issue, and further I will find that the defendant did intentionally kill the victim while believing that he was in danger but used more force than was reasonably necessary in the situation.

¶ 26. On December 11, 1998, the circuit court sentenced Watkins to 30 years in prison. Watkins filed a postconviction motion; the circuit court denied it without a hearing.

¶ 27. Watkins then filed a direct appeal, alleging that: (1) the State had failed to disprove his defense that the shooting was accidental; (2) his trial counsel had provided ineffective assistance by failing to find and present evidence at critical points regarding Malone's background; (3) the case was not fully or fairly tried; (4) his 30–year sentence was excessive; and (5) he was entitled to resentencing so that the circuit court could consider newly obtained evidence about Malone's character. *Watkins,* 2001 WI App 103, ¶ 1.

¶ 28. The court of appeals reversed Watkins' conviction, determining that "the evidence did not disprove, beyond a reasonable doubt, Watkins' defense that the shooting was accidental."[10] *Id.* at ¶ 2. It stated that,"[A]ccepting the evidence the trial court believed

---

[10] The court of appeals reversed Watkins' conviction and remanded the case to the circuit court, but did not explain whether Watkins was subject to retrial or was simply acquitted. In his brief to this court, Watkins seemingly believed that the court of appeals decision would result in a new trial. In oral

and relied upon to support its verdict, we conclude that the evidence, viewed most favorably to the State and to the verdict, did not disprove Watkins' accident defense beyond a reasonable doubt." *Id.* at ¶ 17. The court of appeals did not address the remainder of the issues. *Id.* at ¶ 2.

¶ 29. The State petitioned for review, and we granted the petition. The State now asserts that this court should reverse the court of appeals' decision. It argues that: (1) Watkins did not have a valid claim of accident because such a defense requires that the actor be performing a lawful act and Watkins was unlawfully pointing a loaded gun at Malone; (2) in finding that Watkins killed Malone intentionally, the court found that the State had disproved Watkins' accident defense; (3) the court of appeals applied an improper standard of review—the reasonable hypothesis of innocence—when assessing the circuit court's findings; (4) there is sufficient evidence in the record to support Watkins' conviction; and (5) the controversy was fully and fairly tried and Watkins is not entitled to a new trial.

¶ 30. Watkins contends that this court should affirm the court of appeals or grant a new trial. He asserts that: (1) he was engaged in a lawful act of self-defense when Malone attacked him and they struggled for the gun; (2) the shooting was an accident; (3) the court of appeals properly reviewed the circuit court's findings and properly determined that the cir-

argument, however, the parties acknowledged that the court of appeals opinion would likely result in an acquittal with no retrial.

cuit court did not find that the State disproved Watkins' accident defense; or (4) he is entitled to a new trial in the interest of justice.[11]

## II. ANALYSIS

¶ 31. Watkins asserted at trial that he was acting in lawful self-defense when he pointed the gun at Malone. He did not, however, claim that he shot Malone while acting in self-defense. He insisted that he did not intentionally pull the trigger, even in self-defense, but that the shooting occurred accidentally while he and Malone struggled for possession of the gun.

¶ 32. The court of appeals decided this case on the issue of sufficiency of the evidence, determining that there was insufficient evidence admitted at trial to disprove Watkins' accident defense. *Id.* at ¶ 17. An understanding of the interplay among accident, intent, and self-defense is necessary to review this case. We therefore begin our review by examining the accident defense and its relationships to intent and self-defense.

A. Accident and Intent

¶ 33. "Accident" is a defense to homicide recognized at common law and specifically recognized in Wisconsin statutes dating back to 1849. *See* Wis. Stat.

---

[11] The parties also disagree as to whether Watkins' trial counsel was ineffective in not presenting evidence of Malone's character to show that he acted consistently with that character, whether the 30–year prison sentence was excessive, and whether the circuit court erred in sentencing Watkins without considering information regarding Malone's character and history of violence. None of these issues was addressed in the court of appeals majority opinion, and we need not reach them here.

ch. 133, §§ 6–7 (1849). The 1849 statutes divided homicides into four categories: murder, manslaughter, justifiable homicide, and excusable homicide. Wis. Stat. ch. 133, § 1 (1849). Homicides committed by accident were deemed "excusable."

> Such *homicide is excusable when committed, by accident and misfortune* ... or *in doing any other lawful act by lawful means with usual and ordinary caution, and without any unlawful intent;* or by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation, *or upon a sudden combat without any undue advantage being taken, and without any dangerous weapon being used,* and not done in a cruel or unusual manner.

Wis. Stat. ch. 133, § 6 (1849) (emphasis added).

¶ 34. Excusable homicides were distinguished from justifiable homicides, which consisted of homicides committed under various circumstances, including by a person:

> When committed *in the lawful defence of such person,* or of his or her husband, wife, parent, child, master, mistress, or servant, when there shall be a reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and there shall be imminent damage of such design being accomplished.

Wis. Stat. ch. 133, § 5.2 (1849) (emphasis added).

¶ 35. The excusable homicide statute remained in virtually identical form until 1956.[12] Section 340.30 (1953) provided in part:

---

[12] These statutes were renumbered several times. In 1925 they became Wis. Stat. §§ 340.30 and 340.31. *See* ch. 4, Laws of 1925.

Excusable homicide. Such homicide is excusable when committed by accident and misfortune ... or in doing any other lawful act by lawful means with usual and ordinary caution and without any unlawful intent. . . .

¶ 36. When the legislature substantially revised the Wisconsin Criminal Code, it repealed § 340.30. *See* § 63, ch. 696, Laws of 1955; *see also State v. Seifert,* 155 Wis. 2d 53, 63, 454 N.W.2d 346 (1990); William A. Platz, *The Criminal Code,* 1956 Wis. L. Rev. 350. The new criminal code established affirmative defenses to criminal liability, specifically: intoxication, mistake, privilege, coercion, necessity, self-defense and defense of others, and defense of property and protection against retail theft. *See* Wis. Stat. §§ 939.42, 939.43, 939.44, 939.45, 939.46, 939.47, and 939.49 (1955–56).

¶ 37. Accident was not an enumerated defense. However, two reports of the Judiciary Committee, one from 1950 and another from 1953 make clear that the legislature, in enacting Wis. Stat. § 939.45(6) (privilege), intended to incorporate excusable homicide by accident or misfortune into the statute. *See* V Wisconsin Legislative Council, *Judiciary Committee Report on the Criminal Code,* at 34 (1950); VII Wisconsin Legislative Council, *Judiciary Committee Report on the Criminal Code,* at 39 (1953). Section 939.45 established that "the defense of privilege can be claimed" for various enumerated reasons, including: "When for any other reason the actor's conduct is privileged by the statutory or common law of this state." Wis. Stat. § 939.45(6) (1955–56). The text of § 939.45(6) has remained unchanged since 1956.

¶ 38. The parties disagree as to whether accident is truly an affirmative defense. Watkins contends that accident is an affirmative defense and that it works as any other affirmative defense—once the accused pro-

284

duces some evidence of accident, the State must disprove accident beyond a reasonable doubt. Conversely, the State asserts that accident is not an affirmative defense, but rather operates only to negative the elements of intentional, reckless, or criminally negligent conduct.

■■■■

¶ 39. We conclude that accident is not a true affirmative defense. An "affirmative defense" is defined in Black's Law Dictionary as "a defendant's assertion raising new facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim *even if all allegations in the complaint are true.*" *Black's Law Dictionary* 151 (7th ed. 1999) (emphasis added). To illustrate, a defendant who successfully raises the affirmative defense of perfect self-defense may be found not guilty *even if the State proves that the defendant killed a person intentionally.*

¶ 40. This court has long viewed affirmative defenses in precisely this manner: "An affirmative defense does not implicate proof of elements of the crime." *State v. Stoehr,* 134 Wis. 2d 66, 84 n.8, 396 N.W.2d 177 (1986) (citing V Wisconsin Legislative Council, *Judiciary Committee Report on the Criminal Code,* at 54 (1953)). In *State v. Schulz,* this court differentiated between an affirmative defense and "an element of the crime," stating that "[an] affirmative defense . . . does not serve to negative any facts of the crime which the State is to prove in order to convict." 102 Wis. 2d 423, 429, 307 N.W.2d 151 (1981) (quoting *Patterson v. New York,* 432 U.S. 197, 206–07 (1977)).

██

¶ 41. Accident is a defense that negatives intent, and may negative lesser mental elements. In *State v. Bond,* a case in which a defendant attempted to invoke the accident defense, we stated:

> [The defendant] claims the most the state proved was homicide by misadventure. This is a legalistic way of stating the killing was an accident. Misadventure is described as an excusable homicide such as when a person unfortunately kills another in doing a lawful act *without any intent to kill* and without criminal negligence.

41 Wis. 2d 219, 228, 163 N.W.2d 601 (1969) (emphasis added). If a person kills another by accident, the killing could not have been intentional. As the court of appeals has stated, "All reasonable persons know that intent is the antithesis of accident." *State v. Ambuehl,* 145 Wis. 2d 343, 352, 425 N.W.2d (Ct. App. 1988). Because accident negatives intent, it cannot truly be an affirmative defense to a charge of intentional homicide. *See Stoehr,* 134 Wis. 2d at 84 n.8.

██

¶ 42. In theory, as the defendant argues, accident may also negative causation. *See Hall v. State,* 431 A.2d 1258, 1259 (Del. 1981). However, this objective is usually subsidiary to negativing intent, because an accident defense cannot succeed if the state proves intent.

██

¶ 43. The State recognizes that although accident is not an affirmative defense, the State must still disprove accident beyond a reasonable doubt when a defendant raises it as a defense.[13] It contends, however, that when the State proves intent to kill beyond a

---

[13] We stated in *Moes v. State* that:

reasonable doubt, it necessarily disproves accident. We agree. The accident defense prevails in a homicide case only in situations in which "a person unfortunately kills another in doing a lawful act *without any intent to kill* and without criminal negligence." *Bond,* 41 Wis. 2d at 228 (emphasis added); *see also* Wis. Stat. § 340.30 (1953) (defining "excusable homicide" as "homicide . . . committed by accident and misfortune . . . in doing any . . . lawful act by lawful means with usual and ordinary caution and without any unlawful intent"). Consequently, the State disproves accident in a case of first- or second-degree intentional homicide if it proves intent to kill beyond a reasonable doubt. It disproves accident in other homicides if it *proves* all the elements of the respective homicide or it *disproves* that the defendant was acting lawfully or that the defendant was acting without criminal negligence.

## B. Accident and Self-Defense

■

¶ 44. Watkins asserted at trial that he was acting in self-defense when he pointed a gun at Malone, and that the gun fired because of an accident. Although self-defense permits the threat of force or intentional use of force, and although accident negatives intent, the parties agree that a claim of self-defense is not neces-

[P]rior to the codification of the criminal code in 1955, the state was required to disprove beyond reasonable doubt statutory defenses of excuse or justification presented by the defense. These defenses were redefined in the 1955 criminal code as "privilege," and the precodification allocation of burden of proof was expressly preserved. . . . [Section] 939.70, Stats. indicates that the state must still bear the burden of proof once a defense of excuse or justification is raised.

91 Wis. 2d 756, 764–65, 284 N.W.2d 66 (1979).

sarily inconsistent with a concurrent claim of accident. In *State v. Gomaz,* 141 Wis. 2d 302, 313, 414 N.W.2d 626 (1987), this court found no inconsistency when a defendant who wielded a knife claimed that she acted in self-defense and also asserted that the stabbing of the victim occurred because the victim "overtook [the defendant's] intentions by forcing himself upon her." The court noted that, "Other jurisdictions have similarly held that assertions of self-defense and accident are not always inconsistent, such as to require rejection of one in order to accept the other." *Id.* at 313 n.7.

¶ 45. The parties cite various cases from other jurisdictions, and other sources, for the proposition that self-defense and accident are not necessarily inconsistent. In *Gunn v. State,* 365 N.E.2d 1234, 1239 (Ind. Ct. App. 1977), the court stated that "[B]ecause the proper exercise of the right to defend oneself is a lawful act, such an act may satisfy the requirement that the accused be engaged in a lawful act when a killing occurs accidentally." In *Commonwealth v. Turner,* 506 N.E.2d 151, 153 (Mass. App. Ct. 1987), the court stated, "[T]he principles of self-defense may be involved in an accident defense, not for purposes of establishing the defense of self-defense but to show that the defendant was engaged in a lawful act." Similarly, an "accused is entitled to be acquitted where he was lawfully acting in self-defense and his assailant's death resulted from misadventure or accident, such as the accidental discharge of a weapon in the struggle over its possession." *A Treatise on the Law of Crimes (Clark & Marshall)* § 7.02, at 476 (Callaghan & Company 7th ed., 1967). We agree with the cited decisions and treatises that self-defense and accident are not mutually exclusive. We agree also that a defendant may demonstrate that he or she was acting

288

lawfully—a necessary element of an accident defense—by showing that he or she was acting in lawful self-defense.

¶ 46. Watkins contends that he was acting in lawful self-defense "in drawing the gun and pointing it at Malone in self-defense, to keep Malone at bay until Supervisor Dorr arrived."

¶ 47. By contrast, the State contends that Watkins cannot assert an accident defense because he pointed the gun at Malone, in violation of Wis. Stat. § 941.20(1)(c), Endangering safety by use of a dangerous weapon.[14] According to the State's theory, the evidence at trial established that:

> Watkins was not acting in self-defense when he pointed the gun at Malone. Because Watkins was not acting in self-defense, his pointing a gun at Malone was an unlawful act; and, even if Malone was killed during a struggle for the gun, the defense of accident does not apply since the killing would have occurred while Watkins was engaged in an unlawful act of pointing a gun.

The State further asserts that, "Because the evidence supported the trial court's conclusion that Watkins was not acting in self-defense, the evidence was sufficient to disprove the defense of accident."

¶ 48. Watkins counters that in finding him guilty of second-degree intentional homicide, imperfect self-defense, "the trial court did indeed find that Watkins

---

[14] Wisconsin Stat. § 941.20 provides in part:

(1) Whoever does any of the following is guilty of a Class A misdemeanor:

. . . .

(c) Intentionally points a firearm at or toward another.

289

was acting lawfully in self defense, at least up to the instant when Malone was shot."

¶ 49. The circuit court in this case found that Watkins' actions constituted imperfect self-defense, but did not specifically address the issue of whether he was acting lawfully in pointing the gun at Malone.

¶ 50. The court of appeals did address this issue, and rejected the State's position, which it characterized as "Watkins, having introduced a loaded gun into a volatile situation, could not claim that the shooting was accidental." *Watkins*, 2001 WI App 103, ¶ 24. The court of appeals stated, "We cannot conclude . . . as a matter of law, that a person, fearing further attack, who arms himself with a loaded gun, points it at the aggressor, warns him to stay away, and calls for help has precluded the invocation of an accident defense to a shooting that occurs when the aggressor struggles for the gun." *Id.* at ¶ 25. We agree.

¶ 51. The text of the self-defense statute, Wis. Stat. § 939.48, answers the question. We examine the text to ascertain under what circumstances the privilege of self-defense may authorize a person to lawfully point a gun at another person.

¶ 52. Wisconsin Stat. § 939.48(1) consists of three sentences.[15] The first sentence establishes the privilege

---

[15] Wisconsin Stat. § 939.48(1) provides:

Self-defense and defense of others. (1) A person is privileged to threaten or intentionally use force against another for the purpose of preventing or terminating what the person reasonably believes to be an unlawful interference with his or her person by such other person. The actor may intentionally use only such force or threat thereof as the actor reasonably believes is necessary to prevent or terminate the interference. The actor may not intentionally use force which is intended or likely to cause death or

to *threaten or intentionally use force* to prevent or terminate what the person reasonably believes to be an unlawful interference with his or her person.

¶ 53. The second sentence limits the *use or threat of force* to only that force which the person reasonably believes is necessary to prevent or terminate the unlawful interference.

¶ 54. The third sentence limits the *use of deadly force,* restricting its use to situations in which the person reasonably believes that deadly force is necessary to prevent imminent death or great bodily harm. The third sentence does not limit the *threat* of deadly force, only the *use* of deadly force.

¶ 55. Reading all three sentences together, it is clear that under the plain language of § 939.48(1) a person may *use* deadly force only when the person reasonably believes that the use of deadly force is necessary to prevent *imminent death or great bodily harm.* But the person may *threaten* to use deadly force if the person reasonably believes that the threat is necessary to prevent or terminate *an unlawful interference.*

¶ 56. One who violates Wis. Stat. § 941.20(1)(c) by "intentionally point[ing] a firearm at or toward another," threatens the use of force. It follows that under the plain language of Wis. Stat. § 939.48(1) a person is privileged to point a gun at another person in self-defense if the person reasonably believes that such

great bodily harm unless the actor reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself.

a threat of force is necessary to prevent or terminate what he or she reasonably believes to be an unlawful interference.

¶ 57. This reading is confirmed by Wis. Stat. § 939.45, which provides in part: "The fact that the actor's conduct is privileged, although otherwise criminal, is a defense to prosecution for *any* crime based on that conduct" (emphasis added). The section continues: "The defense of privilege can be claimed under any one of the following circumstances: .... (2) When the actor's conduct is in defense of persons ... under any of the circumstances described in s. 939.48 . . . ."[16]

¶ 58. As noted above, the defense of accident is a defense to a charge of intentional homicide only if the person who caused the death was acting lawfully and with no criminal intent. We conclude that pointing a gun at another person as a threat of force does not necessarily preclude the possibility of asserting the accident defense so long as the person *reasonably* believes that such a threat of force is necessary to prevent or terminate what he or she *reasonably* believes to be an unlawful interference. See *State v. Head*, 2002 WI 99, 255 Wis. 2d 194, 648 N.W.2d 413, and *State v. Camacho*, 176 Wis. 2d 860, 865, 872, 501 N.W.2d 380 (1993) for a discussion of the objective reasonable threshold necessary to assert perfect self-defense.

---

[16] For a discussion of privilege, see *State v. Dundon*, 226 Wis. 2d 654, 594 N.W.2d 780 (1999).

## C. Claims of Self-Defense in Intentional Homicide Prosecutions

¶ 59. Watkins was tried on a charge of first-degree intentional homicide, pursuant to Wis. Stat. § 940.01, but was convicted of second-degree intentional homicide, pursuant to Wis. Stat. § 940.05. We therefore turn next to the relationship between first-degree intentional homicide and second-degree intentional homicide, in cases involving claims of self-defense.

¶ 60. Wisconsin Stat. § 940.01, first-degree intentional homicide, has two elements: (1) the causing of death, (2) with intent to kill. Section 940.01 provides in relevant part:

> (1) OFFENSES. (a) Except as provided in sub. (2), whoever causes the death of another human being with intent to kill that person or another is guilty of a Class A felony.
>
> . . . .
>
> (2) MITIGATING CIRCUMSTANCES. The following are affirmative defenses to prosecution under this section which mitigate the offense to 2nd-degree intentional homicide under s. 940.05:
>
> (a) Adequate provocation. . . .
>
> (b) Unnecessary defensive force. Death was caused because the actor believed he or she or another was in imminent danger of death or great bodily harm and that the force used was necessary to defend the endangered person, if either belief was unreasonable.
>
> (c) Prevention of felony. . . .
>
> (d) Coercion; necessity. . . .
>
> (3) BURDEN OF PROOF. When the existence of an

affirmative defense under sub. (2) has been placed in issue by the trial evidence, the state must prove beyond a reasonable doubt that the facts constituting the defense did not exist in order to sustain a finding of guilt under sub. (1).

¶ 61. Wisconsin Stat. § 940.05, second-degree intentional homicide, has the same two elements: (1) the causing of death, (2) with the intent to kill. The difference between the two degrees of intentional homicide is that with first-degree intentional homicide, there are no circumstances which mitigate the offense to second-degree intentional homicide. Wisconsin Stat. § 940.05, second-degree intentional homicide, provides in relevant part:

(1) Whoever causes the death of another human being with intent to kill that person or another is guilty of a Class B felony if:

(a) In prosecutions under s. 940.01, the state fails to prove beyond a reasonable doubt that the mitigating circumstances specified in s. 940.01(2) did not exist as required by s. 940.01(3); . . .

¶ 62. The mitigating factors that can reduce first-degree intentional homicide to second-degree intentional homicide are adequate provocation, unnecessary defensive force, prevention of a felony, and coercion or necessity. Wis. Stat. § 940.01(2)(a)-(d). The state is not obligated to disprove all possible mitigating circumstances every time it prosecutes under Wis. Stat. § 940.01. It must disprove a mitigating circumstance beyond a reasonable doubt only when the mitigating circumstance is placed in issue by the trial evidence. To be placed in issue, there must be "some"

evidence in the trial record. *See Head,* 2002 WI 99; *State v. Felton,* 110 Wis. 2d 485, 511, 329 N.W.2d 161 (1983).

¶ 63. The mitigating circumstance at issue in this case is unnecessary defensive force, the equivalent of imperfect self-defense. Wisconsin Stat. § 940.01(2)(b) provides in part:

> (b) Unnecessary defensive force. Death was caused because the actor believed he or she or another was in imminent danger of death or great bodily harm and that the force used was necessary to defend the endangered person, if either belief was unreasonable.

¶ 64. Unnecessary defensive force mirrors Wis. Stat. § 939.48, self-defense and defense of others, which provides:

> (1) A person is privileged to threaten or intentionally use force against another for the purpose of preventing or terminating what the person reasonably believes to be an unlawful interference with his or her person by such other person. The actor may intentionally use such force or threat thereof as the actor reasonably believes is necessary to prevent or terminate the interference. *The actor may not intentionally use force which is intended or likely to cause death or great bodily harm unless the actor reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself* (emphasis added).

¶ 65. The present jury instruction on self-defense, Wis JI—Criminal 1014 explains "the effect of the law of self-defense" in a situation in which a person uses or threatens to use force in a defensive manner:

> [I]f the defendant. . . reasonably believed the force used was necessary to prevent imminent death or great

bodily harm to himself, the defendant is not guilty of either first or second degree intentional homicide.

If the defendant . . . actually but unreasonably believed the force used was necessary to prevent imminent death or great bodily harm to himself, the defendant is guilty of second degree intentional homicide.

If the defendant . . . did not actually believe the force used was necessary to prevent imminent death or great bodily harm to himself, the defendant is guilty of first degree intentional homicide.

¶ 66. Having discussed the workings of accident, intent, and self-defense, and the relationship between first and second-degree intentional homicide, we examine the circuit court's findings and decision in this case. We first address the proper standards for our review.

D. Standards for Determining Sufficiency of Evidence

¶ 67. The standard for determining whether sufficient evidence supports a finding of guilt by a jury or a circuit court is complicated, but well established. In *State v. Poellinger,* 153 Wis. 2d 493, 451 N.W.2d 752 (1990), we addressed the standards applicable to circumstantial as opposed to direct evidence, and the standards applied by the circuit court in finding sufficient evidence for a conviction. We stated that, "Regardless of whether the evidence presented at trial to prove guilt is direct or circumstantial, it must be sufficiently strong and convincing to exclude every reasonable hypothesis consistent with the defendant's innocence in order to meet the demanding standard of proof beyond

a reasonable doubt."[17] *Id.* at 502 (citing *Schwantes v. State,* 127 Wis. 160, 176, 106 N.W. 237 (1906)). Under this standard, a defendant must be acquitted at trial unless the evidence which the jury believes and relies upon to support its verdict cannot be reconciled to support any reasonable theory consistent with the innocence of the accused. *Poellinger,* 153 Wis. 2d at 502.

¶ 68. *Poellinger* also discussed standards used by an appellate court in reviewing the judge or jury's determination. We said:

> [I]n reviewing the sufficiency of the evidence to support a conviction, an appellate court may not substitute its judgment for that of the trier of fact unless the evidence, viewed most favorably to the state and the conviction, is so lacking in probative value and force

---

[17] Review of a circuit court's decision on sufficiency of evidence is made complicated because appellate courts do not independently apply the "reasonable hypothesis" test.

"The burden of proof is upon the state to prove every essential element of the crime charged beyond reasonable doubt. The test is not whether this court or any of the members thereof are convinced [of the defendant's guilt] beyond reasonable doubt, but whether this court can conclude the trier of facts could, acting reasonably, be so convinced by evidence it had a right to believe and accept as true. . . . The credibility of the witnesses and the weight of the evidence is for the trier of fact. In reviewing the evidence to challenge a finding of fact, we view the evidence in the light most favorable to the finding. Reasonable inferences drawn from the evidence can support a finding of fact and, if more than one reasonable inference can be drawn from the evidence, the inference which supports the finding is the one that must be adopted. . . ."

*State v. Poellinger,* 153 Wis. 2d 493, 503–04, 451 N.W.2d 752 (1990) (quoting *Johnson v. State,* 55 Wis. 2d 144, 147, 197 N.W.2d 760 (1972) (quoting *Bautista v. State,* 53 Wis. 2d 218, 223, 191 N.W.2d 725 (1971))).

that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt.

153 Wis. 2d at 507 (citing *State v. Wilson,* 149 Wis. 2d 878, 894, 440 N.W.2d 534 (1989)). Under this standard, a reviewing court may overturn a verdict on grounds of insufficiency of the evidence only if the trier of fact could not possibly have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt. It may not overturn a verdict "even if it believes that the trier of fact should not have found guilt based on the evidence before it." *Id.*

E. The Circuit Court's Findings and Decision in Light of the Standards for Accident, Intent, and Self-Defense

¶ 69. The circuit court in this case found Watkins guilty of second-degree intentional homicide. To reach this conclusion, the court first had to determine that the State proved that (1) Watkins killed Malone, and (2) Watkins intended to kill Malone. When the statute uses the phrase "with intent to," it means that the actor "has a purpose to do the thing or cause the result specified, or is aware that his . . . conduct is practically certain to cause that result." Wis. Stat. § 939.23(4). Hence, the circuit court had to determine, in effect, that Watkins had a purpose to kill Malone. The court then had to determine whether self-defense was placed in issue by the trial evidence.

¶ 70. Charged with first-degree intentional homicide, Watkins was entitled to conviction of the mitigated charge of second-degree intentional homicide if the State failed to disprove beyond a reasonable doubt that he *actually* believed that he was in imminent danger of death or great bodily harm or that he *actually* believed

that he had used the amount of force necessary to protect himself, even if one of those beliefs was unreasonable. Wis. Stat. § 940.01(2)(b). He was entitled to be found not guilty unless the State *disproved* beyond a reasonable doubt that one of those beliefs was reasonable. *Head*, 2002 WI 99.

¶ 71. In finding Watkins guilty of second-degree intentional homicide, the circuit court stated:

> [T]he Court finds that the State has proven the charge of second degree intentional homicide where privilege of self-defense is an issue, and further I will find that the defendant did intentionally kill the victim while believing that he was in danger but used more force than was reasonably necessary in the situation.

¶ 72. The circuit court found that Watkins caused Malone's death: "That [Watkins] caused the death of [Malone] is really not in dispute. It was supported by the testimony of the medical examiner and the defendant himself."

¶ 73. The circuit court found that the State proved beyond a reasonable doubt that Watkins intended to kill Malone. It stated:

> [H]is intent was made, clearly, by his taking the gun out, putting the clip in the gun, pulling the slide back and loading the bullet in the chamber, moving toward the victim, his statements of—to his foreman, get down here before I kill him, he then discharged the weapon within one to three inches of the victim, and his statement afterwards, I killed him, I do believe forms a more than adequate basis to find that the State has proven that element beyond a reasonable doubt.
>
> I don't believe that the defendant formed the intent well in advance of the action or even minutes in advance, but the evidence supports that when the victim approached him and reached for the gun,

whether you call it instinct or not, he formed the requisite intent and acted upon it and rejected other available options.

¶ 74. The circuit court also found that Watkins "used more force than was necessary in the situation." More specifically, it found that:

[T]he defendant did not reasonably believe that the force used was necessary to prevent the imminent death or great bodily harm to himself. A reasonable person in circumstances of the defendant would not have believed that the amount of force used by the defendant was necessary to prevent imminent death or great bodily harm. A reasonable person might fear the victim's anger, and I think this defendant did.

And the injuries to [Watkins'] head and chest, as well as the DNA under [Malone's] fingernails, support the testimony that a struggle did take place, but the statement [Watkins] made to Detective Antreassian on the same day was that at no time did [Malone] physically punch or assault him, and during the testimony of the trial, [Watkins] stated that he never thought of leaving the room because he was not that scared, and even after the third confrontation, his testimony was that he was a little afraid, but things were not out of control.

The situation that he described does not support a belief that it was reasonable that he could be in fear of imminent death or great bodily harm. . . .

¶ 75. As quoted above, the court made clear that it found Watkins not to have *reasonably* believed that he was in imminent danger of danger of death or great bodily harm, and not to have *reasonably* believed that he needed to take the steps he took and to use the force he used to prevent death or great bodily harm.

300

¶ 76. Under the standard of review established in *Poellinger,* we must draw any required inferences in favor of the verdict reached by the circuit court. 153 Wis. 2d at 504. In addition, we may assume that any finding of fact not made by the circuit court can be "determined in a manner ·that supports the circuit court's ultimate decision." *State v. Martwick,* 2000 WI 5, ¶ 31, 231 Wis. 2d 801, 604 N.W.2d 552.

¶ 77. It is vitally important to maintain this standard of review. An appellate court should not sit as a jury making findings of fact and applying the hypothesis of innocence rule de novo to the evidence presented at trial. *Poellinger,* 153 Wis. 2d at 505–06. "It is not the role of an appellate court to do that." *Id.* at 506. Because there are echoes of the hypothesis of innocence rule in the court of appeals decision, we are reluctant to reverse the defendant's conviction and affirm the court of appeals on grounds that the evidence was not sufficient to sustain the conviction. We conclude that the record contains sufficient evidence to support the conviction.

¶ 78. At the same time, we share the court of appeals' concern that something in this case is seriously amiss. Consequently, we reverse the defendant's conviction pursuant to Wis. Stat. § 751.06, and remand the case to the circuit court for a new trial.

F. Discretionary Reversal

¶ 79. Wisconsin Stat. § 751.06 recognizes our authority to reverse a judgment or order appealed from "if it appears from the record that the real controversy has

301

not been fully tried, or it is probable that justice has for any reason miscarried." We understand that this discretionary reversal power is formidable. It should be exercised sparingly and with great caution. *Graff v. Roop,* 7 Wis. 2d 603, 606, 97 N.W.2d 393 (1959). We are convinced that it should be applied here.

¶ 80. There are several reasons for our decision:

¶ 81. First, the circuit court did not provide a clear analysis of its thinking on the legal issues surrounding self-defense and accident. When a case is tried to a jury, all the players—judge, jury, prosecutor, defense attorney, and defendant—should understand the parameters of the jury verdict. The preparation of jury instructions forces the parties to clarify the issues on the record and identify what charges and defenses may be considered by the jury. When a case is tried to the court, the court may reach the same conclusion a jury would reach but fail to articulate the operative legal principles for its decision.

¶ 82. Here, the court determined that the defendant was guilty of second-degree intentional homicide. A fact finder should not be permitted to find a defendant guilty of second-degree intentional homicide unless self-defense has been placed in issue by the trial evidence. In his closing argument, Watkins' trial counsel made clear that Watkins did not claim to have believed he was in imminent danger of death or great bodily harm at the time he armed himself. He noted that in Wisconsin, a person may threaten the use of force to repel an attack, and then stated:

> We do not claim that Carroll Watkins felt himself to be in danger of sustaining death or great bodily harm in the hands of Mr. Malone such that he had the right to use deadly force.

302

> What we are saying is that he had a right to *threaten* use of deadly force, a measure of response to the series of attacks from which he had to be protected, . . . . (emphasis added).

¶ 83. The prosecution, in rebuttal to Watkins' closing argument, made abundantly clear that it did not think Watkins had adequately raised the issue of self-defense:

> I believe that if this case was a jury trial, that the Court would not be giving any type of self-defense instruction, that based on the incident that happened here there was absolutely no right for this defendant to use a gun. There was no threat of great harm to this defendant or there was no threat of death to this defendant. He did not have a right to introduce a gun into this argument. So I don't think there should be any theory of self-defense in this matter.

¶ 84. Thereafter, the court found the defendant guilty of an offense that conflicted with the arguments of both counsel. There is evidence in the record to support the court's determination, but both sides could claim an element of surprise. The defendant's counsel would not have been arguing that, "We do not claim that Carroll Watkins felt himself to be in danger of sustaining death or great bodily harm" if he knew the court would respond by saying that, "The defendant did not reasonably believe that the force used was necessary to prevent imminent death or great bodily harm."

¶ 85. It is not clear from the record exactly how the court evaluated the defendant's accident defense at trial. Accident is not mentioned in the court's oral decision. Had the court submitted instructions to the jury, the court and the parties could have agreed upon legal principles to work from or at least identified points of disagreement. In retrospect, the defendant's reliance

on the accident defense may have been grounded on assumptions that would not have survived a jury instruction conference. In a trial to the court, the parties and the court must work to assure that all parties share an understanding of the principles that will govern the court's decision.

¶ 86. Second, Watkins complains that his trial counsel was ineffective for failing to investigate Glenn Malone's criminal history and reputation for violence, and to proffer such evidence either at trial or at sentencing. We have no need here to resolve issues about the admissibility of such evidence, but we are concerned that counsel appears not to have been aware of such evidence, for whatever value it might have been to the defendant's case.

¶ 87. The defense counsel's preparation contrasts with the prosecutor's uncompromising attack on Watkins. For instance, during the trial, the defendant raised questions about his *Miranda* warnings. He was cross-examined by the prosecutor who asked:

Q: You've been through Miranda rights before; is that correct?

A: Been a long, long time, but yes.

Q: Well — You've — were arrested for assault, is that correct, in the State of — in the State of Nebraska; is that correct?

A: I believe, yes, sir.

Q: And you were advised of your Miranda rights when you were arrested for assault; is that right?

A: Yes, sir.

Q: And you were advised of your Miranda rights in the State of Nebraska for disorderly conduct and resisting arrest; is that correct?

304

A: Yes.

Q: So you had been through this before, is that correct?

A: Probably fifteen some years ago, yes, sir.

A jury would not have been permitted to hear this damaging information, which Watkins' counsel should have challenged as inadmissible. *See* Wis. Stat. § 906.09.

¶ 88. Third, the court decided against the defendant on virtually every point in contention. It wrote, in response to the motion for post-conviction relief, that "the Court did consider the defendant's assertion of accident and found it not credible in light of all of the evidence." It apparently dismissed the defendant's testimony of a fourth confrontation, in which Watkins claimed that Malone "slammed his fist into my jaw, which loosened up my lower plate and ended up cutting my gum pretty bad," and that Malone hurled him backwards in his chair, slamming his head against the wall. The court never mentioned that incident in its oral decision, even though Detective Antreassian had reported that Watkins had told him, shortly after the shooting, that "all of a sudden Glenn got up again from his bed for the fourth time and he approached Watkins, who was still seated in the chair, and he grabbed Watkins with both hands around the front part of the hooded sweatshirt and lifted Watkins completely off the chair, throwing him back in the chair, saying he was going to fuck him up."[18] The court was impressed with a seemingly contradictory statement in the police report, to the effect that "at no time did Glenn physically

---

[18] The criminal complaint, sworn to by Detective Antreassian, summed up the fourth confrontation as follows: "Carroll Watkins stated that Glenn Malone then stomped off and went

punch or assault" Watkins, but the court left out the second half of the sentence: "but did grab him by the front of the sweatshirt and shook him intensely." This same sentence fragment is used to rebut the defendant's claim of a struggle. The court briefly acknowledges "testimony that a struggle did take place," but the court never discussed any struggle for the gun.

¶ 89. We have difficulty reconciling these findings with the court's necessary but unstated finding that Watkins had an actual belief in an unlawful interference with his person and an actual but unreasonable belief that the force he used was necessary to prevent imminent death or great bodily harm. These findings are implicit in a finding of second-degree intentional homicide based upon unnecessary defensive force. The court minimized any struggle but emphasized that Watkins' gun was discharged "within one to three inches of the victim." The court said that the proximity of the weapon was evidence of intent to kill. Nonetheless, the court found mitigating circumstances, imperfect self-defense.

¶ 90. Fourth, the court so heavily emphasized retreat that it raises questions about its analysis of the evidence. The court said:

(1) The defendant "formed the requisite intent and acted upon it *and rejected other available options.*"

(2) "A reasonable person would probably want to get the heck out of that room. . . . [T]he door was always a reasonable option. The defendant was

---

back to bed. Carroll Watkins became upset. Carroll Watkins stated that he was upset because Glenn Malone had lifted him up more forcefully."

closest to the door and went for the gun instead . . . ."

(3) "[E]ven though he had no duty to retreat from the room, I can't find that lethal force would be necessary if he could have taken just a few steps and been free and away from the victim."

(4) "He had the opportunity to retreat with safety. Retreat seems, clearly, to have been a viable option and one that he knew about during the entire confrontation, but according to his testimony, never considered."

(5) A reasonable person would not take the steps that the defendant took in the circumstances that he found himself in . . . never retreating . . . ."

¶ 91. The rule on retreat was stated by this court in *Miller v. State,* 139 Wis. 57, 75–76, 119 N.W. 850 (1909):

[The common law rule of retreat] has been superseded by a doctrine in harmony with the divine right of self-defense; the doctrine that when one is where he has a right to be and does not create the danger by his own wrongful conduct, he may stand his ground, if assailed by another, and in case of his honestly and reasonably believing himself to be in imminent danger of losing his life or receiving some great bodily harm at the hands of such other, he may use such means as, presently to him, reasonably, seem necessary to avert the impending danger, even to taking the life of his assailant.

¶ 92. More recently, the rule was discussed in such cases as *State v. Herriges,* 155 Wis. 2d 297, 455 N.W.2d 635 (Ct. App. 1990), and *State v. Wenger,* 225 Wis. 2d 495, 593 N.W.2d 467 (1999). *Wenger* discusses

307

Wis JI—Criminal 810, entitled "Self-Defense: Retreat," which reads:

> There is no duty to retreat. However, in determining whether the defendant reasonably believed the amount of force used was necessary to prevent or terminate the interference, you may consider whether the defendant had the opportunity to retreat with safety, whether such retreat was feasible, and whether the defendant knew of the opportunity to retreat (emphasis added).

¶ 93. As part of his closing argument, the prosecutor said:

> Mr. Watkins did not have to introduce a gun into this event. This was basically a fairly nonserious type of argument prior to this defendant introducing the gun into the event. There were many alternatives, certainly.
>
> The jury instruction says that in a self-defense case that the defendant does not have a — does not have a duty to retreat, though it's something that the Court should consider in making its finding, and I think here it's clear that there was not even close to the need for the type of force that this defendant used to stop whatever minor skirmish that was going on between the defendant and Mr. Malone.

¶ 94. It is clear that the court was persuaded by the argument that the defendant had better options than getting his gun. The court's reliance on the principles in the instruction in analyzing the mere introduction of the gun, gives the appearance of nullifying the retreat rule. Watkins was arguably in a room where he had a right to be, was not the aggressor, and did not *use* deadly force when he threatened Malone with a gun.

¶ 95. Fifth, the defendant received a 30–year prison sentence. This sentence shocked Judge Fine, who sided with the State in voting to uphold the conviction. Judge Fine wrote: "Given Watkins's concededly exemplary life prior to this tragic shooting, I believe that the sentence is shockingly not 'right and proper under the circumstances.' " *Watkins,* 244 Wis. 2d at 228 (Fine, J., dissenting). The court's lengthy sentence simply adds to this court's conclusion that the conviction should be reversed in the interest of justice.

¶ 96. Although we reverse the defendant's conviction on grounds different from the grounds stated by the court of appeals, we recognize and commend the meticulous review of the evidence embodied in the court's opinion.

### III. CONCLUSION

¶ 97. To order a new trial because the real controversy has not been fully tried, this court need not determine that a new trial would likely yield a different result. We stated in *Vollmer v. Luety* that:

> [U]nder the first category, when the real controversy has not been fully tried, an appellate court may exercise its power of discretionary reversal without finding the probability of a different result on retrial. Under the second category [justice has miscarried], however, an appellate court must first find a substantial probability of a different result on retrial before exercising its discretionary reversal power.

156 Wis. 2d 1, 16, 456 N.W.2d 797 (1990) (citing *State v. Wyss,* 124 Wis. 2d 681, 735, 456 N.W.2d 797 (1985)).

¶ 98. In this case it is far from clear whether a new trial will result in a different verdict, or in precisely the same verdict previously rendered. However, for the

reasons stated above, we conclude that this case has not been fully and fairly tried. Accordingly, we modify and affirm the decision of the court of appeals reversing Watkins' conviction. We further remand the case to the circuit court for a new trial.

*By the Court.*—The decision of the court of appeals is modified and affirmed and, as modified, the cause is remanded to the circuit court.

¶ 99. DIANE S. SYKES, J., did not participate.